COMMONWEALTH *vs.* JAY BENSON.

Plymouth. November 10, 1994. - December 8, 1994.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Homicide. Evidence*, Photograph, Relevancy and materiality. *Practice, Criminal*, Argument by prosecutor, Capital case.

At a murder trial, five color photographs showing the extent of the victim's injuries were clearly relevant to whether the murder was committed with extreme atrocity or cruelty, to the defendant's claim that he acted in self-defense, and to support the testimony of an eyewitness; the judge did not abuse his discretion in admitting the photographs in evidence. [118-119]

At the trial of a murder case, metaphorical comments in the prosecutor's closing argument could not have adversely influenced the jury [119]; nor did the prosecutor's remarks about the expert witnesses deny the defendant a fair trial where the judge gave clear instructions on the jury's function and the standards for evaluating expert testimony [119-120]; nor did the prosecutor's proper comment on the defendant's theory that he was unable to control his conduct have any tendency to shift the burden of proof, on which the judge gave full instructions [120-121].

In an appeal from a conviction of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty, there was no basis for relief under G. L. c. 278, § 33E. [121]

INDICTMENT found and returned in the Superior Court Department on March 28, 1989.

The case was tried before *Cortland A. Mathers*, J.

*Jack M. Atwood* for the defendant.

*Mary E. Mullaney*, Assistant· District Attorney, for the Commonwealth.

GREANEY, J. The defendant was convicted of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty. On appeal, he argues that a new trial should be ordered because (1) the trial judge erred in

admitting in evidence five photographs of the victim taken after his death; and (2) the prosecutor engaged in prejudicial final argument. We reject these arguments. We also find no basis to exercise our power under G. L. c. 278, § 33E (1992 ed.). Accordingly, we affirm the defendant's conviction.

The evidence warranted the jury in finding the following facts. On the afternoon of February 20, 1989, the victim, a seventy-five year old man, came to the defendant's third-floor apartment looking for the defendant who owed him money. Neither the defendant nor his wife, Linda Smart, answered the door even though they were sitting in the living room and were aware that the victim was trying to see them. After the victim left, the defendant placed a metal pipe, about two feet in length, in a corner of the living room. At about 7 P.M., the defendant telephoned the victim and invited him to the defendant's apartment, claiming to have money to repay the loan. In the apartment, the victim and the defendant sat in the kitchen and consumed alcoholic drinks; Smart was also present. The victim complained that the defendant had not repaid the loan. The defendant became angry. As the two men talked, Smart went into the bedroom to get her coat.

From the bedroom, Smart heard a thumping noise and moaning coming from the kitchen. When she returned to the kitchen, she saw the victim lying face down on the floor with the defendant standing behind him, holding a metal pipe in his hand. Smart ran out of the apartment to a nearby store. When Smart returned, she found herself locked out of the apartment. Smart went to the porch and looked through the window. She saw the defendant, kneeling on one knee over the victim, who was now face up on the floor. Smart also saw the defendant hit the victim three times by swinging the metal pipe with both hands.

The defendant eventually let Smart back into the apartment. The victim was on the floor with a bloody towel over his head, the defendant was holding a pipe; blood was everywhere in the kitchen. The defendant handed Smart the victim's wallet (which, Smart later discovered, had $250 in it). The victim's body, with Smart's help, was dragged to the

porch, where the defendant lifted the victim and threw him feet first from the third-floor porch. There was medical testimony that the victim was unconscious, but still alive, when the defendant dropped the victim's body from the porch.

The defendant and Smart attempted to clean up the bloody apartment after the crime, and the defendant took steps to hide his involvement. The defendant eventually telephoned the police, telling them that he thought a murder had occurred. The police investigation rapidly inculpated the defendant, who was arrested and charged with murder in the first degree.

The following additional background from the trial is pertinent. The Commonwealth presented its direct case through the testimony of seven witnesses and fifty-seven exhibits. A principal witness against the defendant was Smart who had divorced him prior to the trial. It was disclosed to the jury that Smart had been charged with being an accessory after the fact to murder, but that the charge had been dismissed prior to trial. Smart was extensively cross-examined about her involvement in the killing and her motive to lie.

The defendant did not testify, but his counsel presented twelve witnesses for the defense in his direct case. Through a State trooper, the defendant obtained testimony that Smart had provided the police with inconsistent stories about the murder weapon. The defendant used photographic and other evidence to claim that the victim had hit him first either with an ashtray or a bottle causing a gash on the defendant's forehead. [1] This evidence was used by the defendant to raise an issue of self-defense.

There was also evidence that the defendant was very intoxicated. Smart testified that, prior to the murder, the defendant had consumed ten beers and some whiskey, and there was evidence that he had also taken the drugs Vasotec and Xanax, which had been prescribed for him, and some chloral

---

[1] Smart testified that, after the victim's body had been thrown off the third-floor porch, the defendant slammed his head on an "entertainment center," producing the gash.

hydrate pills (a sleep-inducing medication) that had been prescribed for Smart. Four police officers and a newspaper reporter who came to the scene testified that the defendant was visibly intoxicated when observed by them. (The judge had entered an order before the trial which suppressed all statements made by the defendant to the police while in his apartment and at the police station prior to 3:30 A.M., on February 21, 1989, on the basis that the defendant was too intoxicated to make a knowing and voluntary waiver of his rights against self-incrimination.)

The defendant also presented a psychiatrist and a clinical neuropsychologist. The psychiatrist testified that the defendant suffered from frontal lobe syndrome which, when combined with the ingestion of drugs and alcohol, would have prevented him from forming deliberate premeditation. The neuropsychologist testified that the defendant had ten documented head injuries and frontal lobe damage which could cause a person to become angry and lacking in an ability to control unacceptable conduct. [2]

Based on all the evidence, the judge instructed the jury on (a) the elements of murder in the first degree by deliberate premeditation, extreme atrocity or cruelty, and felony-murder; [3] (b) the elements of murder in the second degree and voluntary manslaughter; and (c) on the effect of intoxication on the mental elements of the crimes, self-defense, and criminal responsibility. As has been indicated, the jury found the defendant guilty of first degree murder by reason of deliberate premeditation and extreme atrocity or cruelty.

[2] The Commonwealth, in rebuttal, provided expert testimony from a psychiatrist that the defendant did not suffer from any condition which would interfere with his capacity to appreciate the wrongfulness of his conduct or would prevent him from conforming his conduct to the requirements of the law. The defendant was allowed surrebuttal by a psychologist who sought to undermine some of the premises on which the Commonwealth's expert had relied in reaching his opinion that the defendant was criminally responsible.

[3] The Commonwealth's theory here was that the victim had been murdered in the course of an armed robbery. The jury ultimately rejected this theory.

1. The defendant objected to the admission in evidence of five color photographs showing the extent of the victim's injuries. Two of the photographs depict the victim's facial injuries (one photograph also shows a breathing tube and surgical tape which had been placed during medical attempts to save the victim). The other three photographs show injuries to the top and back of the victim's head and to one of his ears and shoulders. The judge admitted the photographs as relevant to the issue of extreme atrocity or cruelty. The defendant contends that the photographs would not have been important in resolving that issue (he suggests the more important evidence on the issue was the testimony of Smart and the medical examiner), and that the photographs were unfairly prejudicial.

"The admissibility of photographic evidence is left to the discretion of the trial judge, and we will overturn the judge's decision only where a defendant is able to bear the heavy burden of demonstrating an abuse of that discretion." *Commonwealth* v. *Waters*, 399 Mass. 708, 715 (1987). See *Commonwealth* v. *Richenburg*, 401 Mass. 663, 672 (1988). "[I]f the photographs possess evidential value on a material matter, they 'are not rendered inadmissible solely because they are gruesome [or duplicative] or may have an inflammatory effect on the jury.'" *Commonwealth* v. *Ramos*, 406 Mass. 397, 407 (1990), quoting *Commonwealth* v. *Bys*, 370 Mass. 350, 358 (1976).

We have examined the disputed photographs. They clearly were relevant to whether the murder was committed with extreme atrocity or cruelty. *Commonwealth* v. *Sielicki*, 391 Mass. 377, 382 (1984). The judge was not required to confine the Commonwealth to the testimony of Smart and the medical examiner in its proof of that theory of first degree murder. As the trial developed, the photographs also had relevance to the defendant's claim that he had acted in self-defense, and to supporting Smart's testimony on the manner in which the metal pipe was used by the defendant to beat the victim. The one photograph showing the victim with a breathing tube and surgical tape did not show the victim's

head as altered by any medical procedure. Compare *Commonwealth* v. *Bastarache*, 382 Mass. 86, 105-106 (1980) (photographs of skull interior produced in course of autopsy). The Commonwealth did not need this photograph, and the judge might have acted in prudence to exclude it. On the whole topic, however, no abuse of discretion has been shown.

2. The defendant objected to portions of the prosecutor's final argument and moved for a mistrial which the judge denied. He now maintains that the prosecutor's comments require a new trial. We disagree.

a. The prosecutor framed her closing argument with reference to the childhood nursery rhyme about the spider and the fly. She recited part of the poem to the jury, and she developed the theme that, like the spider and the fly, the defendant had lured the victim to the apartment, and, once the victim was there, followed through on a plan to murder him. The defendant claims that the prosecutor's remarks unfairly demeaned him.

The prosecutor's argument was metaphorical in nature and could only have been understood as such by the jury. The analogy was not outside the boundaries of evidence as to how the homicide occurred. A certain measure of jury sophistication in dealing with argument like the metaphor used by the prosecutor is to be assumed, *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987), and cases cited, and, based on that principle, we think the jury could not have been adversely influenced.

b. In their arguments both the prosecutor and defense counsel attacked the credibility of the expert witnesses. Defense counsel stated that his psychiatrist was "not a hired gun or a charlatan," referred to the Commonwealth's psychiatrist witness as "Fred Rogers," [4] and argued that this expert had been "manipulating the evidence," and had tried to give

---

[4] This remark was a reference to the host of a popular children's television show known for his friendly and unassuming manner. Defense counsel, after referring to the Commonwealth's psychiatrist as "Fred Rogers," went on in his closing to characterize the psychiatrist's appearance and demeanor as "absolute garbage."

the jury "the whopper, the big whopper." [5] In response, the prosecutor stated that the "hired gun" in the case was not the Commonwealth's psychiatrist but the neurophyschologist called by the defense. [6] She also indicated that none of the experts had agreed with each other, that the expert testimony was "all so much mumbo jumbo and big words," and that "[i]t is within your province as jurors to heave all the expert testimony out and go back to your common sense." The defendant argues that the prosecutor's remarks, summarized above, denied him a fair trial.

The comments in both closings concerning the expert testimony became excessive at times, perhaps motivated by the fact that the defendant's criminal responsibility was a major issue at the trial. The defendant's counsel first interjected the phrase "hired gun" into the discussion before the jury; the prosecutor was making what she apparently thought was fair reply. We think the jury would once again take the criticized argument with a "grain of salt," *Commonwealth* v. *Wallace*, 417 Mass. 126, 134 (1994); *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 277 (1982), and would have understood the prosecutor as suggesting to them that the experts had not been helpful, and that they should resolve the conflicting expert testimony by using their common sense. See *Commonwealth* v. *Moore*, 408 Mass. 117, 133 (1990). The judge gave clear instructions on the jury's function in deciding the facts and the standards for evaluation of expert testimony. Nothing in this claim by the defendant requires reversal.

c. The prosecutor argued to the jury that it was "fair to hold this defendant responsible for the plan he put together to get rid of [the victim] and to save his own skin and the

---

[5] The "whopper" remark was in context a reference to a large hamburger sandwich sold by Burger King "fast food" restaurants. In context, defense counsel was suggesting that the Commonwealth's psychiatrist witness had tried to persuade the jury to accept an unbelievable opinion as to the defendant's criminal responsibility.

[6] This comment was made in the context of the prosecutor's suggesting economic bias on the part of the neuropsychologist based on evidence that he had no medical degree, but earned up to one-half of his income by giving expert opinions, frequently as a witness for the defense.

actions that he undertook in pursuance of that plan because it shows that he had the capacity to form deliberately premeditated malice aforethought, to form malice, to do harm to [the victim], to recognize the unlawfulness of his actions, and to attempt to cover [them] up." The prosecutor repeated the "fairness" theme in two other portions of her closing. The defendant maintains that the argument was an attempt to shift the Commonwealth's burden of proof to him and improperly to suggest that the ultimate issue of the defendant's guilt was a moral rather than a legal question.

In context, the argument was proper. The prosecutor engaged in no pandering to emotion or any attempt to incite a vigilante spirit. She was basically asking the jury to consider the Commonwealth's evidence carefully and to reject the defendant's principal theory that he was unable to control his conduct and therefore not responsible for his acts. We perceive in the remarks no tendency to shift the burden of proof or to dilute the reasonable doubt standard which was fully explained to the jury by the judge.

3. The defendant has made no separate argument that we should exercise our power under G. L. c. 278, § 33E, either to grant him a new trial or to modify the jury's verdict. We have nonetheless reviewed the entire case as required by the statute. *Commonwealth* v. *Scott*, 408 Mass. 811, 812 n.1 (1990). The defendant received a fair trial. The jury rejected all of his claims, concluding that the Commonwealth had disproved them beyond a reasonable doubt. The jury were well warranted in their verdict that the Commonwealth had proved that the defendant was guilty of murder in the first degree by means of deliberate premeditation and extreme atrocity or cruelty. There is no basis for relief under G. L. c. 278, § 33E.

*Judgment affirmed.*