## COMMONWEALTH *vs.* PATRICIA OLSEN.

Berkshire. May 8, 2008. - August 28, 2008.

Present: IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Homicide. Practice, Criminal,* Capital case. *Evidence,* Reputation, Inflammatory evidence, Relevancy and materiality.

At the trial of an indictment charging the defendant with murder in the first degree as a joint venturer, the judge did not abuse his discretion or violate the defendant's right to present a defense by denying her motion in limine to admit the testimony of witnesses who would testify that a third party (the defendant's son, who claimed that the defendant had asked him to commit the murder) had a reputation of being a pathological liar, where, in two instances, the judge properly took no action at all because the motion was not made in connection with a particular witness, and where, in a third instance, the testifying witness did not know the third party or any of the people who made the statements concerning that third party's reputation. [292-293]

At the trial of an indictment charging the defendant with murder in the first degree, as a joint venturer, on theories of deliberate premeditation and extreme atrocity or cruelty, the judge did not abuse his discretion in admitting in evidence the medical examiner's testimony about the nature and extent of the victim's injuries, as well as photographs depicting the injuries, where the testimony and photographs were relevant to the victim's cause of death and to whether the murder was committed with extreme atrocity or cruelty. [293-294]

This court declined to grant the criminal defendant relief under G. L. c. 278, § 33E, where sufficient evidence existed to convict the defendant of murder in the first degree, as a joint venturer, on theories of deliberate premeditation and extreme atrocity or cruelty, and where it was for the jury to decide which witnesses were credible. [294]

INDICTMENT found and returned in the Superior Court Department on March 10, 2005.

The case was tried before *Daniel A. Ford,* J.

*Janet H. Pumphrey* for the defendant.

*David F. Capeless,* District Attorney, for the Commonwealth.

IRELAND, J. The victim, Neil Olsen, died as a result of blunt force trauma and multiple gunshot wounds inflicted by the

defendant's son, the victim's stepson, on the evening of January 9, 2005. Thereafter, in connection with this killing, a jury convicted the defendant of murder in the first degree, as a joint venturer, on the theories of deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel on appeal, the defendant argues that the trial judge erred in excluding evidence of the defendant's son's reputation for lying, and in admitting testimony of the medical examiner accompanied by graphic photographs depicting the victim's injuries. The defendant requests that, pursuant to our power under G. L. c. 278, § 33E, we reduce the verdict or vacate her conviction and grant her a new trial. We affirm the judgment of conviction. We discern no basis to exercise our authority under G. L. c. 278, § 33E.

The jury could have found the following facts. The defendant and the victim were married in 1994. It was the defendant's second marriage. In 1997 or 1998, the defendant's children from her previous marriage, Christopher and Amanda Robinson, came to live with the defendant and the victim at the victim's home in Lanesborough. Christopher and Amanda[1] grew to dislike the victim in part because they considered him to be very strict. Both dropped out of high school and went to live on their own. The victim "banned" Christopher from the house following a confrontation in the fall of 2004.

During their marriage, the victim owned a sign lettering business that he operated out of the barn at his home. The victim had a retirement account valued at $102,807, and a life insurance policy with a death benefit of $75,000. The defendant was the designated primary beneficiary for both assets. The couple had a number of joint bank accounts for the house and their businesses. The defendant once operated a nearby video store in Pittsfield, and, when that business closed in 2003, she opened a restaurant named "Mrs. O's Seafood" in its place. She spent a large amount of money converting the video store into the restaurant.

The defendant managed all the finances for the household and for the businesses. Unbeknownst to the victim, the defendant drained the joint bank accounts, and some accounts were closed for being overdrawn. Many bills for both businesses went unpaid,

---

[1] We use first names where there are multiple witnesses with the same surname.

and some vendors would only supply goods if they were paid cash. The defendant failed to make timely payments on a $21,000 debt to a contractor who helped convert the video store into the restaurant. In 2004, the defendant defaulted on payments on a home equity loan taken out on the victim's house. The bank made a demand for full payment on the loan, in the amount of $40,000, and indicated that, if payment were not made, it would commence foreclosure proceedings. The defendant borrowed $45,000 from the victim's brother to pay the bank under the conditions that she would eventually pay him back and that neither of them would tell the victim about the loan.

By January, 2005, in addition to the $45,000 she had borrowed from the victim's brother, the defendant owed approximately $1,452 to the lessor of the restaurant property; $2,463 on a gas bill; $900 on a water bill; and $5,213 in municipal real estate and personal property taxes for fiscal years 2004 and 2005. All of the couple's motor vehicle, homeowner, and business insurance policies had been canceled for nonpayment of premiums.[2] The victim's brother attempted to contact the defendant regarding payment of the loan he had given her, but the defendant avoided him.

The defendant spoke with her children and others about her troubled marriage. Amanda observed that the defendant and the victim often argued. The defendant told Amanda and Christopher that she wanted to leave the victim, but could not afford to do so because of a prenuptial agreement that deprived her of any assets if they divorced.[3] The defendant told "jokes" about putting glass or poison in the victim's food.

The defendant told Christopher that she was very unhappy and wanted the victim "gone." She repeatedly asked Christopher to kill the victim, and suggested ways to accomplish it. The defendant remarked that, if the victim were gone, they (the defendant, Christopher, Amanda, and Christopher's daughter[4]) could all be a family again.

---

[2]The victim's life insurance policy was kept in force by deductions the insurer made from the policy's cash value.

[3]No prenuptial agreement was ever found.

[4]Christopher had a child (then eight months old) with a former girl friend. The defendant and the victim frequently would babysit the baby at the victim's

The defendant made it known to Amanda that she wanted the victim dead. She encouraged Amanda to buy a gun and to ask her friends if they knew of anyone who would kill the defendant. The defendant told the father of Amanda's boy friend that the victim was abusive. When he suggested that she leave the victim, she said that "it wasn't that easy." She asked Amanda to ask the father of her boy friend about finding someone to kill the victim. Amanda learned from the defendant that Christopher was going to help the defendant kill the victim, that the defendant was giving him money, and that she had asked him to buy a gun.

In October, 2004, the defendant asked a friend, Patrick Prendergast, if he wanted to kill the victim or knew somebody who would. The defendant looked serious when she asked, but then asserted that she had been joking when Prendergast commented that her queries were "not funny." The defendant remarked to an acquaintance that financial problems were causing marital difficulties for the couple. The defendant told restaurant employees that the victim had called her names, that they had a "rocky part of their marriage," and that the victim might leave her. The defendant was extremely upset and "aggressive to the fact" that she had learned from another that the victim supposedly had wanted her business to fail. The defendant wished that her relationship with the victim would be "like [it] used to be."

On Friday, January 7, 2005, as a result of a motor vehicle stop for an expired registration, the victim first became aware that there was a problem with his motor vehicle insurance and the registration on his truck. The defendant told Christopher that the victim was very angry with her over the incident, and struck her head. The defendant stated that she wanted the victim dead that night. The next day, the defendant told Christopher that she needed him to kill the victim because she could not "take" the victim's verbal and physical abuse any longer. On Sunday, January 9, the defendant spoke with Christopher over the telephone and told him that the victim had struck her again and had slapped Christopher's daughter. The defendant stated that if Christopher did not kill the victim that night, she would leave the victim. On

house. The victim, who was close to the baby, did not want Christopher to visit the baby at the house.

learning from the defendant that the victim had hit her and the baby, Christopher planned to shoot the victim that evening.

The defendant telephoned and spoke with Amanda several times in the days preceding the victim's death. The defendant repeated to Amanda what she had told Christopher about the victim having been physically abusive on Friday. During their last telephone call, which the defendant made at approximately 10:20 P.M. on January 9, the defendant told Amanda that Christopher "said he's going to do that thing" that night, and that if he did not, she would leave the victim. Amanda knew that "that thing" meant killing the victim. Several minutes later, Amanda had a telephone conversation with her boy friend, who was in a New York jail, and repeated what her mother had told her.[5]

At 11 P.M. on January 9, after he had spoken with the defendant, Christopher went to the victim's home and positioned himself inside the barn to wait for the victim to put the horse in her stall for the night.[6] Christopher carried a .22 caliber semiautomatic rifle that he had purchased with money that the defendant had given to him. When the victim appeared at 11:30 P.M., Christopher shot him seven times and crushed his face and head with a rod-like instrument. Christopher ran to the house and went upstairs to the defendant's bedroom. He told the defendant that the victim was dead. The defendant told him that she would have to take sleeping pills to explain why she had not heard any gunshots. At the defendant's direction, Christopher hid the rifle in the closet of his old bedroom. He left the house and went to a nearby hotel.

At approximately 8:30 A.M. the following day, the defendant telephoned 911. Francis Mark Bashara, the chief of police of Lanesborough, responded. The defendant was hysterical in the kitchen, and directed Chief Bashara to the barn. There, he discovered the victim's body on the floor. Chief Bashara observed blood and brain matter in the immediate vicinity. Initially, he believed that the victim had been trampled by his horse. The front pockets of the victim's pants were visible, having been pulled inside out.

---

[5]The correctional facility recorded the conversation.

[6]It was the victim's routine to feed the horse and put it into the barn each night.

The defendant informed police that the victim had no life insurance or money. She recounted that the night before she and the victim had played a video game, after which she took some "Tylenol PM" because she was not feeling well, then went to bed. The defendant woke the next morning, found a television still on, and discovered that the victim already had left the house. She told another officer that she and the victim had watched television until 10 P.M. and then had had sexual intercourse before she went to sleep. She added that she had not felt well and took three "Tylenol PM" before going to bed. The victim was not in bed with the defendant when she woke up the following morning. As was customary, the defendant ordered the victim breakfast from her restaurant. After the breakfast had been delivered, at about 8:15 A.M., the defendant took it out to the barn. Nearing the barn, the defendant observed, through a window in the door, the motionless victim on the floor. The garage door leading out to the field and the horse's stall were open.

The defendant told police that she hated the victim's horse and that it would kick when anyone tried to pull burdocks from its mane. She informed them that Christopher did not come to the house as a result of a "big fight" he had had in the past with the victim. The defendant stated that she did not know where Christopher lived. The defendant indicated that she had last spoken with Amanda on January 9, at approximately 8 P.M., for about twenty minutes.

Later that morning, police recovered a pipe behind the barn. The pipe had blood and hair on it. The discovery led police to reject their initial suspicion that the horse had killed the victim. Police also found nine .22 caliber discharged cartridge casings in the barn.

That same day, Christopher called a friend, Stephen Charles Abriel, and told him that the victim had been trampled by his horse and killed. In November, 2004, Abriel had observed a .22 caliber semiautomatic rifle in the trunk of Christopher's automobile. Sometime before January 9, 2005, Christopher told Abriel that the defendant had asked him to kill the victim over the summer, but that he could not do it. On the evening of January 10, 2005, Abriel reported this prior conversation with Christopher to police.

On the night of January 10, Amanda arrived at the house. The defendant told Amanda that Christopher shot the victim, hid the gun in his old bedroom, and left. She told Amanda that the police would find the bullets once they performed an autopsy, and that, despite what she had told police, she never went into the barn because she did not want "to see it."

Christopher returned to the house at 9 P.M. He did not recall if he had used a pipe to hurt the victim, or if he had gone through the victim's pockets. Christopher stated that he did have money in his possession but did not know its source.

The defendant told Christopher to remove the rifle. He took it outside, across the snow-covered ground, and threw it into a culvert, where police later recovered it. Christopher returned to the house and left shortly thereafter.

On Tuesday, January 11, after obtaining the results of the victim's autopsy, police questioned Christopher. Christopher initially denied any involvement in the victim's shooting, but after further questioning and after police pointed out the presence of blood (the victim's) on his pants, he admitted to shooting the victim. Although Christopher told police on January 11 that the defendant previously had asked him to kill the victim, it was not until February 3 that he directly stated that he had killed the victim at the defendant's request.

On January 11, police questioned the defendant at her home. They informed her that the autopsy had revealed that the victim's death was not an accident and that they were investigating his death as a homicide.

The police further questioned the defendant, after advising her of her Miranda rights, at the police station. Though repeatedly asked, the defendant did not initially reveal that Christopher had been at the house on the evening of January 10. In response to a question regarding who might want to hurt the victim, the defendant did not mention that Christopher and the victim did not get along. The defendant told police that the victim had not been physically abusive to her.

When police informed the defendant that Christopher had been arrested for the victim's murder and that he had admitted that he killed the victim at her request, the defendant acknowledged that Christopher and the victim did not get along. She initially told

police that she did not know that Christopher had a gun, but later stated that she had heard that he had a gun. The defendant told police that while she had not entered the barn, she had knelt down and touched the victim's leg. She stated that she had not seen any blood.[7] The defendant told police that the victim did not have any life insurance, and that she and the victim had a prenuptial agreement. The defendant stated that she had a cellular telephone, but that the victim did not. The defendant had no explanation for records showing that her voice mail had been accessed from her cellular telephone on the night of January 9, at 11:55 P.M. and 11:58 P.M.

On the morning of January 11, police noticed a fresh set of footprints in the snow, going from the victim's property to a nearby culvert and then returning to the property. Using a map drawn by Christopher, police recovered a .22 caliber semiautomatic rifle from the culvert and determined, based on testing and comparison to the recovered discharged cartridge casings, that it was the murder weapon. A rifle box was seized from the trunk of Christopher's automobile.

The defendant testified that she loved her husband and had a strong marriage. She added that she and the victim had experienced financial troubles previously, but always had managed to recover. The defendant denied having asked Christopher or Amanda to kill the victim, or to find somebody to kill him. The defendant also denied that she wanted the victim gone. While the defendant and the victim had argued in the past, the defendant stated that the victim had hit her only once after she struck him.

The defense suggested that Amanda and Christopher were disgruntled over what they perceived as the defendant's abandonment of them in favor of the victim. According to the defense, the defendant's children were liars who hated the victim and had motive to kill him. Further, the defense alleged that Christopher implicated the defendant only to get the charge against him reduced.[8]

---

[7]Photographs admitted in evidence showed the victim's body lying in a pool of blood, along with blood spattered on the walls of the barn.

[8]The Commonwealth represented at oral argument that, after the defendant's trial, Christopher pleaded guilty to murder in the second degree.

Through cross-examination of the Commonwealth's witnesses, the defense painted Christopher as a derelict who hated the victim, an irresponsible absentee father, a thief, and a liar. The defense solicited testimony that the defendant had a good relationship with the victim and was devastated by his death. The defendant was so distraught after the victim's death that those around her, including the victim's brother, were concerned she might commit suicide and had her hospitalized in a psychiatric unit at a nearby hospital.

1. *Evidence of Christopher's reputation for lying.* The defendant argues that the judge abused his discretion and violated her constitutional right to present a defense by denying her motion in limine to admit the testimony of approximately twenty-two witnesses who would testify that Christopher had a reputation of being a pathological liar. There was no error.

"A party's reputation is based on information from sources in the community who have come in contact with the person in question and who have the means of knowing what that person's general character is." *Commonwealth* v. *Arthur*, 31 Mass. App. Ct. 178, 179 n.3 (1991), quoting *Commonwealth* v. *Gomes*, 11 Mass. App. Ct. 933, 933 (1981). "It is what is said of the person under inquiry in the common speech of his neighbors and members of the community or territory of repute, from which his reputation for truth or falsehood arises, and not what the impeaching witness may have heard others say who numerically may be few and insignificant." *F.W. Stock & Sons* v. *Dellapenna*, 217 Mass. 503, 506 (1914). Whether the testimony is admissible lies within the discretion of the trial judge. *Commonwealth* v. *Arthur, supra.*

Here, the defendant overlooks the fact that the judge initially took no action on her motion, leaving the issue to be decided as it arose with particular witnesses. This action was proper, as the defendant had not laid any foundation for the admission of such evidence on a general basis.

The issue next arose when the defendant attempted to obtain the reputation evidence through the testimony of a State trooper. The judge did not err in then denying the defendant's motion because the voir dire established that the trooper did not know Christopher or any of the people who made statements to the police (including those who made statements regarding Christo-

pher's reputation for lying). See *Commonwealth* v. *Baxter*, 267 Mass. 591, 593 (1929) (upholding exclusion of reputation evidence obtained by inquiry of person who was not member of community).

When the issue was brought up the next day of trial, the judge did not commit error because, again, the motion was not made in connection with a particular witness, and thus, there was no foundation for the judge properly to consider the issue. Further, the motion concerned particular bad acts of untruthfulness, evidence of which is inadmissible. See *F.W. Stock & Sons* v. *Dellapenna*, *supra* at 506-507. On this ground the judge also properly excluded the proffered testimony of a former employee of the defendant. The employee was expected to testify that Christopher had once lied about his having been born in Ireland and had lied by stating that there was jewelry hidden at the restaurant. See *id.* We point out that the reputation evidence eventually was admitted during the cross-examination of Abriel, and that Christopher, during his testimony, admitted to being a liar and to having lied repeatedly to police during the investigation of the victim's death.

2. *Admission of the medical examiner's testimony and photographs.* The medical examiner testified about the nature and extent of the victim's injuries. She explained that the victim's face was deformed, fractured, and depressed. She also stated that the victim suffered massive destruction of his skull and facial bones, brain laceration, and bullet entry wounds to the head. During her testimony, the Commonwealth admitted photographs (which we have examined) depicting the injuries, and the medical examiner referred to the photographs to describe the nature and extent of those injuries. The defendant did not object to the admission of this testimony or to the admission of the photographs.

The defendant argues that the admission of the medical examiner's testimony and the photographs, both of which were graphic and gruesome, were irrelevant and unfairly prejudicial, thus depriving her of due process and a fair trial. There was no error. "[I]t is well settled that where a defendant 'is accused of committing murder with extreme atrocity or cruelty and with premeditation and deliberation, that photographs indicating the force applied and portraying the injuries inflicted may properly be

admitted on the issue of whether the murder was committed with extreme atrocity or cruelty, as well as on the issue of premeditation and deliberation.' " *Commonwealth* v. *Berry*, 420 Mass. 95, 108 (1995), quoting *Commonwealth* v. *Ramos*, 406 Mass. 397, 406-407 (1990). That the photographs may be gruesome or have an inflammatory effect on the jury does not render them inadmissible so long as they possess evidentiary value on a material matter. *Commonwealth* v. *Ramos*, *supra* at 407. Here, the testimony and photographs were relevant to the victim's cause of death and to whether the murder was committed with extreme atrocity or cruelty. The judge did not abuse his considerable discretion in admitting this evidence. See *Commonwealth* v. *Berry*, *supra*.

3. *G. L. c. 278, § 33E.* We have examined the record pursuant to our duty under G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief. There was sufficient evidence to convict the defendant of murder in the first degree, as a joint venturer, on the theories of deliberate premeditation and extreme atrocity or cruelty. It was for the jury to decide which witnesses were credible. That the Commonwealth offered evidence of prior consistent statements of Amanda and Christopher, from a friend of Amanda and from a friend of Christopher, may have served to bolster their credibility and to undermine the defendant's credibility. There is no basis to disturb the jury's verdict.

*Judgment affirmed.*