GANTS, C.J.
**66 *732 On the morning of Monday, August 8, 2011, the defendant stabbed Miguel Rodriguez twenty-eight times, killing him. The issue at trial was not whether the defendant committed the killing -- the defendant admitted to doing so in his testimony -- but whether the killing was triggered by Rodriguez's own attempt to stab the defendant. Defense counsel argued that the killing was mitigated because the defendant used excessive force in self-defense and acted in the heat of passion on reasonable provocation and in sudden combat, and therefore asked a Superior Court jury to return a verdict of voluntary manslaughter rather than murder in the first degree. The jury implicitly rejected the defendant's version of the incident and found the defendant guilty of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty.
On appeal, the defendant claims that he is entitled to a new trial because the judge erred in various evidentiary rulings, because the prosecutor made prejudicial statements in closing argument that were not supported by the evidence, and because the judge overruled the defendant's objection to instructing the jury regarding the third prong of malice. He also claims that that the jury should have been instructed that, to find the defendant guilty of murder in the first degree on the theory of extreme atrocity or cruelty, they must find that he appreciated the consequences of his choices. In addition, he asks this court to exercise its extraordinary powers under G. L. c. 278, § 33E, to reduce the verdict or to order a new trial.
We conclude that the judge made no prejudicial error in his evidentiary rulings, that nothing in the prosecutor's closing argument created a substantial likelihood of a miscarriage of justice, that the judge's instructions regarding murder in the first degree on the theory of extreme atrocity or cruelty were proper, and that the jury's verdict is consonant with justice. We therefore affirm the defendant's conviction of murder in the first degree, and decline to exercise our authority under G. L. c. 278, § 33E, to reduce the verdict or to order a new trial.
Background. Because the defendant claims that he acted in self-defense and that the jury's verdict of murder in the first degree is not consonant with justice, we provide a detailed summary of the evidence at trial, reserving discussion of some of the facts to the relevant claims of error.
The defendant was born in Holyoke, and he has moved between Massachusetts and Puerto Rico several times. He most recently **67 moved back to Holyoke from Puerto Rico on July 21, 2011, approximately three weeks before the killing. In the weeks leading up to the victim's death, the defendant resided with his uncle, Joel Montanez; Montanez's longtime girlfriend, Celia Rojas; and their children in a fifth-floor apartment in Holyoke.
The victim resided with his sister on the fourth floor of the same apartment building. The defendant and the victim met soon after the defendant moved into the building; the defendant occasionally sold drugs to the victim, and used drugs with him. Montanez testified that he had warned the defendant about the victim, telling the defendant that the victim had a reputation for "being trouble," that he carried a gun, and that the defendant should "watch himself" when he was with the victim.
On the Thursday before the killing, the defendant was using drugs with the victim and "Tutti," a neighbor from the third floor of their apartment building, when Tutti pulled out a gun. The victim said that that was the weapon he would use "if *733 anything happened." At that time, the defendant did not understand the victim's statement to be a threat, because he was on friendly terms with the victim. The relationship between the defendant and the victim soured, however, after the victim lent the defendant cocaine valued at one hundred dollars on the Saturday before the killing.[1] Before dawn the next morning, at some time after 2 A.M. , the victim called the defendant to ask for cocaine. The defendant testified that the victim came to his apartment door multiple times in the next several hours, repeatedly asking for drugs, which the defendant did not provide.
Later that Sunday morning, the defendant, along with other family members, went to the defendant's grandmother's home in Holyoke. The victim came to the home and asked the defendant to return his one hundred dollars. The defendant told the victim that he would make some telephone calls to attempt to obtain the money. The victim then left, but he returned ten or fifteen minutes later and threatened to do something to the defendant if he did not get the money. The defendant told the victim that he would pay the one hundred dollars by 4 P.M.
After the victim left, the defendant returned to Montanez's apartment. Montanez testified that the victim came by the apartment **68 four or five times, looking to speak with the defendant. At approximately 1 P.M. , according to the defendant, the victim asked again for the one hundred dollars and told the defendant that he would "blow [the defendant] up" if he did not get the money. The defendant interpreted this to mean that the victim was threatening to shoot him. At approximately 3 P.M. , the defendant went to his aunt's home. While the defendant was there, the victim telephoned, said he wanted to see the defendant, and threatened to kill the defendant if he (the victim) did not get his money.
The defendant testified that, after leaving his aunt's home at approximately 10 P.M. , he went to his cousin's house to get a knife to protect himself. The defendant described the knife as an old, brown, rusty knife with a long black handle. The defendant testified that he then waited downstairs in front of his apartment building, hoping to prevent the victim from reaching his family. He said that if he saw the victim, he intended to tell the victim that he did not have the money "and whatever happened was going to happen." The defendant testified that he eventually grew tired of waiting for the victim and went upstairs to Montanez's apartment at approximately 10:30 or 11 P.M. [2]
When the defendant came upstairs, where Montanez was playing dominoes, Montanez observed the defendant take a chrome-colored knife from his waistband and place it on his lap. Montanez noted that the knife had no guard where the handle met the blade.
*734 The next morning, at approximately 8:15 A.M. , a witness who was driving his vehicle on the street in front of the defendant's apartment building saw two men running from the further front entrance of the apartment building toward the street.[3] One man was attempting to run away from another man, who was holding his shirt to prevent his flight. The witness stopped his vehicle to watch the encounter. He saw the man who was holding the victim's **69 shirt spin the victim around and start "punching" the victim in the chest. The victim had his hands in the air, screaming and trying to get away; there was nothing in the victim's hands. The witness saw blood and observed the "punching" man holding a shiny object; at this time, he realized that the man was not punching the victim, but stabbing him with a knife. The victim fell to the ground, and then he got up and staggered to lean on another vehicle.[4] The man who had stabbed the victim ran into the other front entrance of the apartment building.
That same morning, Montanez was awakened by knocking on the front door of his apartment. Rojas opened the door, and the defendant -- whose hand was bleeding -- entered. Montanez testified that he observed the defendant place a knife on top of the bathroom sink, and that this was the same knife he had seen the defendant with the previous evening. He heard the defendant say only "cut." Montanez then told the defendant to leave the apartment, which the defendant did.
After arriving at the scene, Holyoke police Detective David Usher followed a blood trail on the floor, stairs, and walls of the apartment building up to the fifth floor. When he knocked on the door to Montanez's apartment, Rojas answered and allowed him in. The detective saw blood on the floor near the front bedroom and in the hallway, and noted that the front hallway had been recently mopped. A protective sweep of the apartment did not locate the defendant.
The defendant testified that, after he left Montanez's apartment following the stabbing, he went to the home of the cousin who had lent him the knife and returned it to him. The defendant admitted that the knife Montanez had seen on the bathroom sink that morning was the knife used in the stabbing. The defendant then went to his grandmother's home in Holyoke, where he showered and took medication for the pain arising from his wounds. From there, the defendant went to his aunt's home, where he ate and slept. Eventually, the defendant's cousin's boyfriend drove him to a home in Springfield, where the defendant went to sleep for the night. The following day, the defendant's cousin's boyfriend asked the defendant if he was going to turn himself in to the police. The defendant responded that he would, and the boyfriend drove him to his grandmother's house. There, the defendant **70 asked his mother to call the police, who arrived and arrested him.
Holyoke police Detective James McGillicuddy noted that, when he arrested the defendant, the defendant had slice wounds to his right thumb, ring finger, pinky finger, and left forearm. He also had a *735 "scratch type injury" to his right upper arm.
The medical examiner who examined the victim's body, Dr. Katherine Lindstrom, found twenty-eight "sharp-force injuries," likely caused by a knife, all of which contributed to the victim's death. She noted that any of three stab wounds that penetrated the victim's lungs, as well as a stab wound that struck his carotid artery, would have sufficed on its own to cause death. She opined that someone with these stab wounds would be able to survive "likely minutes."
The prosecutor and the defendant agreed that the fight between the defendant and the victim began in the vestibule of the apartment building, but disagreed as to how that fight began. The defendant testified that the victim had called the telephone in Montanez's apartment early that morning and said he wanted to see the defendant. Soon thereafter, the victim knocked on the apartment door and told the defendant to come with him. The defendant testified that he left the knife he had borrowed from his cousin in the apartment, because the victim was watching him as he left. The victim took the defendant to his fourth-floor apartment, handed him a cellular telephone, and told him to call someone for the money he owed the victim. The victim then said, "[L]et's go. Somehow we're going to make some money." The two walked down the stairs to the ground floor, with the victim walking behind the defendant. When they reached the ground floor, the defendant opened the door leading to the vestibule and let the victim walk ahead of him. As that door was closing behind the defendant, the victim attacked the defendant with a knife, attempting to stab him. The defendant grabbed the knife away from the victim, cutting his own hand in doing so. The defendant then started to stab the victim, noting that "[e]verything happened so fast, so crazy, so bizarre." He continued to stab the victim in the vestibule until both fell through the front door connecting the vestibule to the sidewalk, and the defendant fell on top of the victim. The defendant continued to stab the victim while he was on top of the victim because he was afraid that the victim might pull out a gun and start shooting him. Both the victim and the defendant eventually stood up, but the victim fell back down. At this time, the defendant **71 returned to the apartment building and started ringing doorbells until the inside door opened and he was able to run upstairs to Montanez's apartment.
The prosecutor, in contrast, argued that the defendant -- unprovoked -- attacked the victim in the vestibule by stabbing him in the back, and continued to stab him outside while the unarmed victim attempted to run away.
The defendant's version of events suffered from at least four flaws that, considered together, made it unbelievable. First, the knife that the defendant brought upstairs to the bathroom in Montanez's apartment after the stabbing -- which he admitted was the knife used in the stabbing -- was identified by Montanez as the same knife that he had seen on the defendant's lap during the previous night's dominoes game.
Second, the eyewitness's observation of the assault is not consistent with the defendant's account. The eyewitness described the victim attempting to run away, with his hands in the air, and the defendant attempting to prevent his flight by grabbing his shirt, eventually succeeding in spinning the victim around so that they faced each other, with the defendant then "punching" the victim in the chest. The defendant, in contrast, said that he fell on top of the victim upon leaving the vestibule. In addition, the jury saw and heard *736 evidence that the victim had been stabbed multiple times in the back and the back of the neck. Where the eyewitness did not testify to seeing the victim get stabbed in the back, it may be inferred that these injuries occurred in the vestibule. This is consistent with the defendant's testimony that he let the victim enter the vestibule first, and permits the inference that the defendant had the opportunity to strike the first blow from behind the victim.
Third, the victim's sister, who lived with him, had given the victim her keys to the apartment before she left for work, because the victim did not have his own set of keys. Those keys were found in the vestibule, which suggested that the victim was carrying them in his hand before the assault commenced. If the victim had intended a "sneak attack," it is unlikely that he would do so with a knife in one hand and his keys in another. But if the "sneak attack" was perpetrated by the defendant, one might expect that the victim would drop his keys after being stabbed.
Fourth, the defendant admitted that, the night before the killing, he waited for the victim outside the apartment building, armed with a knife he had just borrowed from his cousin, planning to tell **72 the victim that he did not have the one hundred dollars and "whatever happened was going to happen." Where the victim had access to Tutti's gun, and told the defendant that he would use that gun if anything happened, it is likely that the victim -- if he had attempted to attack the defendant -- would have done so with a gun and not a knife. The defendant, in contrast, had access to a knife but not a gun, had armed himself with a knife the previous evening because of the victim's continued threats regarding his nonpayment of one hundred dollars, and had prepared to encounter the victim with the knife in his waistband.
Discussion. 1. Alleged errors in the judge's evidentiary rulings. The defendant argues that the judge erred in three evidentiary rulings. First, he claims that the judge erred in sustaining the prosecutor's objection to defense counsel's question to the defendant's mother, "[D]id he indicate to you in any way that he wanted to turn himself in?" The defendant contends that the defendant's out-of-court statement to his mother was admissible for the purpose of demonstrating his consciousness of innocence. We need not decide whether such testimony was properly excluded, because any error was cured by the fact that the jury heard abundant evidence from three separate sources that the defendant turned himself in to the police at his grandmother's house.
Before the objection to the question posed to the defendant's mother was sustained, she had already testified that she called the police "so that [the defendant] could turn himself over to the police."[5] McGillicuddy, who made the arrest, likewise testified that the defendant's mother called a State police trooper and that the defendant turned himself in without incident at his grandmother's home. And the defendant himself testified that he "asked [his] mother to call the cops so [he] could turn [him]self in." Because the jury heard ample evidence that the defendant surrendered himself to the police voluntarily, we conclude that the defendant suffered no prejudice from the judge's evidentiary ruling, even if it were error.
*737 Second, the defendant claims that the judge erred in sustaining objections to three questions that sought to elicit the defendant's fearful state of mind at the time of the killing, which he contends **73 was relevant to his claim that he acted in self-defense. We recognize that a defendant's state of mind at the time of a killing may be relevant where there is an issue of self-defense, or the excessive use of force in self-defense. See Commonwealth v. Adjutant, 443 Mass. 649, 654, 824 N.E.2d 1 (2005) ; Commonwealth v. Fontes, 396 Mass. 733, 736-737, 488 N.E.2d 760 (1986) ("what was in the defendant's mind when he confronted the victim" relevant in cases involving self-defense claim). But the defendant was not deprived of the opportunity to present such evidence by the judge's evidentiary ruling regarding these three questions.
The defendant contends that the judge erred in sustaining an objection where defense counsel asked the defendant whether the victim had said, referring to Tutti's gun, "If I had any problems, that's what I would use." Because the defendant had previously testified to the victim making this same statement, the judge did not abuse his discretion by sustaining the objection.[6] See Commonwealth v. Hernandez, 481 Mass. 189, 193, 113 N.E.3d 828 (2019) (judges have "discretion to limit repetitive questions"); Commonwealth v. Martinez, 476 Mass. 186, 190 n.4, 65 N.E.3d 1185 (2017), quoting Mass. G. Evid. § 403 (2016) ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of ... needlessly presenting cumulative evidence").
The defendant also claims that the judge improperly sustained an objection to his answer to a question concerning what he had told his cousin about the killing. The defendant's response, "I told him I had a fight, that someone had tried to kill me," was struck in its entirety by the judge. The judge did not abuse his discretion in deciding to strike the defendant's prior out-of-court statement -- even if it were offered solely to show the defendant's state of mind and not to prove the truth of the matter asserted -- where it was redundant of the defendant's earlier testimony regarding the fight that resulted in the killing. See Martinez, 476 Mass. at 190 n.4, 65 N.E.3d 1185 ; Commonwealth v. Romero, 464 Mass. 648, 652 n.5, 984 N.E.2d 853 (2013), quoting P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 8.2.6 (7th ed. 1999) ("statements may be offered as evidence of state of mind without implicating the hearsay rule if the statements either do not contain assertions or are offered without regard to whether the assertions are true").
Lastly, the defendant claims that the judge erred in sustaining **74 an objection to defense counsel's question, "What was your state of mind when you got to your grandmother's house?" Where the defendant went to his grandmother's house after the stabbing and after first having visited his cousin's house, and where the defendant had described his state of mind at the time of the stabbing, the judge did not err in the exercise of his discretion in excluding evidence of the defendant's state of mind when he visited his grandmother. Cf. Commonwealth v. Garrey, 436 Mass. 422, 438, 765 N.E.2d 725 (2002) ("defendant's relevant state of mind ... was his state of mind at the time of the offense, *738 not one and one-half hours later, when he was in police custody").
Third, the defendant claims that the judge abused his discretion by admitting in evidence, over the objection of the defendant, graphic photographs of the victim's injuries, which he claims posed a risk of unfair prejudice that substantially outweighed their probative value. "Relevant evidence is admissible as long as the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." Commonwealth v. Wall, 469 Mass. 652, 661, 15 N.E.3d 708 (2014). "That the photographs may be gruesome or have an inflammatory effect on the jury does not render them inadmissible so long as they possess evidentiary value on a material matter." Commonwealth v. Olsen, 452 Mass. 284, 294, 892 N.E.2d 739 (2008).
Having examined these photographs, we conclude that the judge did not abuse his discretion in finding that the probative value of the photographs with regard to the issues of extreme atrocity or cruelty and self-defense was not substantially outweighed by their potential for unfair prejudice. See Commonwealth v. Alleyne, 474 Mass. 771, 779, 54 N.E.3d 471 (2016), quoting Commonwealth v. Cunneen, 389 Mass. 216, 227, 449 N.E.2d 658 (1983) (where photographs are probative of "extent of physical injuries," "number of blows," "manner and force" with which blows were delivered, and "disproportion between the means needed to cause death and those employed," they are probative of extreme atrocity or cruelty); Commonwealth v. Benson, 419 Mass. 114, 118, 642 N.E.2d 1035 (1994) (photographs admissible where relevant to defendant's self-defense claim). See also Commonwealth v. Barbosa, 457 Mass. 773, 803, 933 N.E.2d 93 (2010), cert. denied, 563 U.S. 990, 131 S.Ct. 2441, 179 L.Ed.2d 1214 (2011), quoting Commonwealth v. DeSouza, 428 Mass. 667, 670, 704 N.E.2d 190 (1999) ("This court has almost never ruled that it was error to admit photographs of crime scenes and homicide victims").
We note that the judge exercised his sound discretion in barring from evidence a close-up photograph of the victim's lifeless body **75 lying near the wheel of a motor vehicle. We also note that, during jury selection, each prospective juror was told individually at sidebar that the evidence in the case might include photographs that were graphic in nature, and was asked whether seeing those photographs would affect his or her ability to be fair. Any prospective juror who answered this question in the affirmative was excused from serving on the jury, so each of the sitting jurors had attested that graphic photographs would not affect his or her ability to be fair. See Alleyne, 474 Mass. at 780, 54 N.E.3d 471 ("A judge may mitigate prejudice" by "alerting the venire during jury selection that graphic photographs might be admitted in evidence, and asking potential jurors if that might cause anyone particular difficulty" [citation and alteration omitted] ). Because the judge properly weighed the probative value of the photographs against the risk of unfair prejudice to the defendant and took appropriate steps to select jurors who would not be unduly influenced by the photographs' graphic nature, we discern no error.[7]
2. Prosecutor's closing argument. The defendant claims that the prosecutor in closing argument made three *739 assertions that found no support in the evidence and that were calculated to improperly play on the jurors' emotions. Where none of the assertions triggered an objection at trial, we consider whether the argument was improper and, if so, whether it created a substantial likelihood of a miscarriage of justice. See Commonwealth v. Rutherford, 476 Mass. 639, 643-644, 71 N.E.3d 481 (2017).
First, the defendant argues that it was improper for the prosecutor to argue that the defendant's obtaining of a knife on the night before the killing was evidence of the defendant's premeditation, where the defendant testified that he obtained the knife from his cousin's home only for self-defense and did not use it during the stabbing.[8] There was nothing improper in this argument.
**76 The jury were not required to credit the defendant's testimony in this regard, and it was fair to argue, based on the evidence presented at trial, that the defendant had obtained the knife on Sunday evening precisely because he intended to preempt the victim's violent threats by killing the victim. It likewise was fair to argue, based on the evidence presented at trial, that the knife from the defendant's cousin's home was in fact the knife used to stab the victim. See Commonwealth v. Parker, 481 Mass. 69, 74, 112 N.E.3d 257 (2018) ("In closing argument, prosecutors are entitled to marshal the evidence and suggest inferences that the jury may draw from it" [quotation, citation, and alteration omitted] ).
Second, the defendant contends that the prosecutor's assertion in closing argument that, as a result of the stabbing, the victim's abdomen was protruding and "his intestines [were] coming out of his stomach" was not supported by the evidence and was designed to shock the jurors and elicit their sympathy. The prosecutor's statement was supported by the testimony of the medical examiner, who, when making reference to a photograph of the victim's abdomen that was in evidence, testified that the victim had a wound to his abdomen that was approximately eight inches deep, that his small intestine was "herniated," and that the herniation was caused by "the force of the intestines pushing it out through the wound." Where the prosecutor's assertion was grounded in the evidence, and where the severity of the stab wounds was relevant to the issue of extreme atrocity or cruelty, the prosecutor's argument was not improper. See Cunneen, 389 Mass. at 227, 449 N.E.2d 658 ("extent of physical injuries" relevant to whether murder was committed with extreme atrocity or cruelty).
Third, the defendant contends that it was improper for the prosecutor to argue that the defendant was motivated to kill the victim because the defendant, a seller of cocaine, was "a very conscientious businessman" who grew sick of the victim, one of his customers, getting "antsy and desperate" when the defendant could not supply him with more cocaine, and that the defendant needed to "establish his turf" as *740 someone new to the Holyoke area.[9] There was evidence at trial that the defendant sold drugs to the victim **77 and others, and it was reasonable to characterize the victim's behavior as "antsy and desperate" where there was evidence that the victim repeatedly demanded repayment of one hundred dollars in cocaine that he purportedly loaned to the defendant. And although it was a stretch to infer from the evidence that the defendant was a "conscientious businessman" based on his small-scale cocaine operation, or that the killing was motivated by the defendant's desire to "establish his turf," these statements could not reasonably be understood as an attempt to play on the jury's emotions. See Commonwealth v. Young, 461 Mass. 198, 204, 959 N.E.2d 943 (2012) ("it is error for a prosecutor to make an argument designed to evoke an emotional, rather than intellectual, response from the jury").
Even if we were to conclude that the prosecutor's statements regarding the defendant's business motives were improper because they were not supported by the evidence, whether this error is reversible depends on our consideration of four factors: "(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusions" (citation omitted). Commonwealth v. Perez, 444 Mass. 143, 151, 825 N.E.2d 1040 (2005). The last of these factors is considered most important. Id. Here, defense counsel did not object to the prosecutor's statements, the judge gave a general instruction informing the jurors that closing arguments "are not evidence in and of themselves," and any purported "business motive" was discussed only in passing, making it unlikely to have influenced the jury's decision. We therefore conclude that even if the prosecutor's inference concerning the defendant's motive to "establish his turf" was not reasonably drawn from the evidence, the error did not create a substantial likelihood of a miscarriage of justice.
3. Third prong of malice. The Model Jury Instructions on Homicide state that where the defendant is being charged with murder based on a theory of extreme atrocity or cruelty, the Commonwealth must prove, as one element of the crime, (1) that the defendant intended to kill the victim (the first prong of malice); or **78 (2) intended to cause grievous bodily harm to the victim (the second prong of malice); or (3) intended to do an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result (the third prong of malice). See Model Jury Instructions on Homicide 50 (2018).[10] The judge charged the jury in accordance with these instructions. *741 The defendant contends that the judge erred in instructing the jury regarding the third prong of malice, because such an instruction was not supported by the evidence and risked confusing the jury. Because the defendant objected to the judge's instruction on the third prong of malice, we review for prejudicial error. Commonwealth v. Vargas, 475 Mass. 338, 348, 57 N.E.3d 920 (2016).
There was neither error nor prejudice. Where there is evidence of the first or second prong of malice, as there was here, the Commonwealth is entitled to an instruction as to the third prong of malice. The element of malice may be satisfied by proving any one of the three prongs, Commonwealth v. Townsend, 453 Mass. 413, 428-429, 902 N.E.2d 388 (2009), and evidence sufficient to support a finding that the defendant intended to kill or to inflict grievous bodily harm will also be sufficient to support a finding that the defendant intended to do an act that, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would result.[11]
Moreover, where the jury found the defendant guilty of murder in the first degree on the theory of deliberate premeditation, and where we affirm the conviction on that theory, there can be no possibility of prejudice arising from an instruction on third prong malice, which affects only the jury's finding on the theory of extreme atrocity or cruelty. See **79 Commonwealth v. Barbosa, 463 Mass. 116, 135, 972 N.E.2d 987 (2012) (where "jury also convicted the defendant based on the theory of deliberate premeditation, we need not address" objections based on theory of extreme atrocity or cruelty).[12]
4. "Appreciated the consequences of his choices." In Commonwealth v. Kolenovic, 478 Mass. 189, 197, 84 N.E.3d 781 (2017), quoting Commonwealth v. Gould, 380 Mass. 672, 686 n.16, 405 N.E.2d 927 (1980), we noted that we had "not reformulated our homicide jurisprudence" to require that a jury find that the defendant "appreciated the consequences of his choices" in order to find a defendant guilty of murder in the first degree on the theory of extreme atrocity or cruelty. The defendant asks us to revisit that issue in this case. We decline to do so where, as earlier noted, the defendant was also found guilty of murder in the first degree on the theory of deliberate premeditation.[13]
*742 Conclusion. This case was ably tried and ably judged, and the verdict was supported by the evidence and consonant with justice. We therefore affirm the conviction and decline to exercise our authority under G. L. c. 278, § 33E, to order a new trial or to reduce the conviction of murder in the first degree.
Judgment affirmed.

The defendant testified that he did not owe the victim one hundred dollars and that he therefore never intended to repay it. According to the defendant, he had earlier lent the victim twenty dollars and cocaine valued at eighty dollars. From the defendant's testimony, it appears that he believed that the victim gave him one hundred dollars in cocaine to repay him for this earlier loan.

Montanez testified that on the night before the killing, he was walking to a neighborhood store when he saw the defendant walking toward the apartment building. The defendant asked Montanez if he had seen the victim, and Montanez responded that he had not. When Montanez returned from the store, the defendant was still outside the apartment building, but he returned to the apartment about five or ten minutes later.

There are two front entrances to the apartment building where the victim and the defendant lived. The first leads to stairs to the apartments on the left side of the building, and the second leads to stairs to the apartments on the right side of the building. The defendant and the victim lived on opposite sides of the building.

Another witness, whose truck the victim leaned against, heard the victim mumble some unknown words and saw him drop to the ground.

Defense counsel then sought clarification as to the timing of the defendant's offer to turn himself in, asking, "When [the defendant] contacted you to turn himself in, was that the next day [after the killing]?" The defendant's mother did not dispute that the defendant wanted to turn himself in, and responded only as to the timing of his request.

The defendant previously testified that on the Thursday before the killing, "Tutti took out a weapon and [the victim] said that that's what he was going to use if anything happened."

We likewise discern no error in the judge's decision to admit the crime scene photographs in the absence of expert testimony regarding the use of force. We have not previously required expert testimony under the circumstances described here, and we decline to do so now.

The statements made by the prosecutor that the defendant claims to be improper were as follows: "[T]here is evidence that the defendant is guilty of premeditation. And we heard some of it from his mouth. He told you that the night before he got a knife. Coincidence? I think not. Of course he wants you to believe it was a rusty, old, little knife. No. What did he tell you he did with the knife? He stood outside on the corner waiting for [the victim] to walk by. He lay [in] wait. He was going to do it the night before if he saw him. He was going to attack [the victim]. He was sick of being harassed by him. He was sick of him showing up at his house, at the parties, asking for money, asking for drugs. He was sick of it."

The statements made by the prosecutor that the defendant claims to be improper were as follows: "[H]e is a very conscientious businessman. He closes his doors at midnight. And [the victim] bothered his business practice. [The victim] was addicted. He was a user of cocaine. The defendant told you that himself. And the defendant was his source. And when the source couldn't supply, maybe he got a little antsy and desperate. He was sick of it. He was being shown up by this five, six, 125-pound man and he wasn't going to have it. He is new to the area. He has to establish his turf. He planned this. He showed up with the knife and attacked [the victim] inside of that lobby."

At the time of the defendant's trial, the 2013 Model Jury Instructions on Homicide were in effect. The instruction concerning the three prongs of malice is identical in the 2013 and the 2018 Model Jury Instructions on Homicide.

Although the defendant contends that the instruction on third prong malice could only have confused the jury, in view of the number and severity of the stab wounds, we note that the defendant testified that his "mind just went blank" when he was stabbing the victim, that he "came into a panic," and that his "mind was not working or thinking right." He also said that he ran back to his apartment after the incident because he feared that the victim would get up and attempt to kill him. In light of this testimony, we cannot eliminate the possibility that a reasonable juror might conclude that the defendant did not intend to kill or grievously injure the victim, but that the requisite intent was proved under the third prong of malice.

The defendant further argues that this court should eliminate the third prong of malice because it focuses on the result of an act as opposed to the specific intent of the actor. We declined to do so in Commonwealth v. Lang, 473 Mass. 1, 9-10, 38 N.E.3d 262 (2015), and we likewise decline to do so here.

We also note that the phrase, "appreciated the consequences of his choices," derives from Commonwealth v. Gould, 380 Mass. 672, 686 n.16, 405 N.E.2d 927 (1980), where we stated, "Hereafter, in addition to the traditional instructions on extreme atrocity or cruelty the judge may also instruct the jurors that if they find from the evidence that the defendant had substantially reduced mental capacity at the time the crime was committed, they may consider what effect, if any, the defendant's impaired capacity had on his ability to appreciate the consequences of his choices." Here, there was no evidence that the defendant's mental capacity was impaired in any way.