NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11444


COMMONWEALTH <u>vs</u>. LASTARANDRE BELL.



Hampden.     December 5, 2014. - November 9, 2015.

Present: Gants, C.J., Spina, Cordy, Duffly, & Lenk, JJ.


<u>Homicide</u>. <u>Evidence</u>, Admissions and confessions, Inflammatory
     evidence, Intoxication, Photograph, Relevancy and
     materiality, Voluntariness of statement. <u>Constitutional
     Law</u>, Admissions and confessions, Voluntariness of
     statement, Waiver of constitutional rights. <u>Practice,
     Criminal</u>, Capital case, Motion to suppress, Admissions and
     confessions, Voluntariness of statement, Waiver, Argument
     by counsel, Instructions to jury. <u>Waiver</u>.



     <u>Indictments</u> found and returned in the Superior Court
Department on February 13, 2007.

     Following review by this court, 460 Mass. 294 (2011), a
pretrial motion to suppress evidence was heard by <u>John S.
Ferrara</u>, J., and the case was retried before him on an
indictment charging murder in the first degree.


     <u>Leslie W. O'Brien</u> for the defendant.
     <u>Katherine E. McMahon</u>, Assistant District Attorney, for the
Commonwealth.


     DUFFLY, J. The defendant was indicted on charges of murder

in the first degree, armed home invasion, arson of a dwelling

house, and violations of an abuse prevention order in the January 29, 2007 death of Julie Ann Nieves,[1] who died as a result of complications arising from second and third degree burns over ninety per cent of her body that she sustained on January 7, 2007.

In April, 2008, a Superior Court jury convicted the defendant of murder in the first degree on a theory of felony-murder,[2] armed home invasion, arson, and violations of an abuse prevention order. The defendant's appeal from the denial of his motion for a new trial was consolidated with his direct appeal. Because the trial judge failed to instruct the jury on second-degree felony-murder with arson as the predicate felony, and

---

[1] The defendant also was indicted on two charges of assault by means of a dangerous weapon against Julie Ann Nieves and Tiffany Cruz, respectively, G. L. c. 265, § 15B (b); one charge of assault and battery by means of a dangerous weapon against Julissa Cruz, G. L. c. 265, § 15A (b); and one charge of assault and battery by means of a dangerous weapon against Larry Key, G. L. c. 265, § 15A (b). During the defendant's first trial, the Commonwealth indicated that it would file, and later did file, a nolle prosequi on the two charges of assault by means of a dangerous weapon; the trial judge allowed the defendant's motion for entry of a required finding of not guilty on the charge of assault and battery by means of a dangerous weapon against Julissa Cruz; and the jury acquitted the defendant of the charge of assault and battery by means of a dangerous weapon against Larry Key.

[2] At that trial, the Commonwealth proceeded on all three theories of murder. The jury did not find the defendant guilty on the theories of premeditation and extreme atrocity or cruelty. In our decision allowing a new trial, we determined that the defendant could be retried on all three theories. See Commonwealth v. Bell, 460 Mass. 294, 309-310 (2011).

because we concluded that the arson conviction merged with the murder conviction, we vacated the murder conviction and remanded the matter to the Superior Court either for entry of a verdict of guilty of felony-murder in the second degree, or for a new trial.  See Commonwealth v. Bell, 460 Mass. 294, 295 (2011).  We affirmed the other convictions.  Id.  At his second trial in December, 2012, before a different judge, a Superior Court jury found the defendant guilty of murder in the first degree on theories of premeditation, extreme atrocity or cruelty, and felony-murder.  The defendant's appeal from that conviction is now before us.

That the defendant was in some way responsible for the flames which engulfed the victim was not an issue at trial; the central issue at trial was whether the burning was intentional or accidental.  The Commonwealth maintained that the defendant deliberately doused the victim with gasoline and set her on fire; the defendant claimed that he had a cigarette in his mouth when the victim threw gasoline on him, the cigarette ignited the gasoline, and the fire jumped from him onto the victim's nightgown.[3]  In this appeal, the defendant challenges the

---

[3] The defendant testified at his first trial that the victim threw gasoline on him, his burning cigarette fell and ignited the gasoline, and the flames spread from his clothes to the victim's; the defendant did not testify at his second trial, and counsel did not pursue this theory of defense.  The defendant's prior recorded testimony, however, was read into the record by

introduction in evidence of his statements that, inter alia, he started the fire but did not intend that anyone get hurt. The defendant argues that these statements, made to police approximately one-half hour after the fire, immediately before and during his arrest, were not voluntarily made, and their admission in evidence following the denial of his motion to suppress requires a new trial. The defendant argues also that a new trial is required because the introduction of graphic photographs of the victim while she was being treated in the hospital unfairly inflamed the jury, and the judge's decision to strike part of defense counsel's closing argument deprived the defendant of the effective assistance of counsel.

We affirm the convictions, and discern no reason to grant a new trial or to exercise our authority to provide relief pursuant to G. L. c. 278, § 33E.

Background. We summarize the facts the jury could have found, reserving certain facts for later discussion.

1. Commonwealth's case. In the fall of 2006, the defendant had been dating Jessica Nieves[4] for about one year. He lived with Jessica; her brother, Daniel; her mother, Julie Ann;

---

the Commonwealth.

[4] Because Julie Ann Nieves and her children, Jessica and Daniel Nieves, share the same surname, we refer to them by their first names. For the same reason, we refer to Caroline Cruz and her daughters Tiffany and Julissa Cruz by their first names.

and other of their relatives in the borough of the Bronx in New York City.  In October, 2006, the defendant moved with Jessica and her family from New York to Springfield.  They moved into an apartment on Warner Street where Julie Ann's sister, Caroline Cruz, lived with her daughters, Tiffany and Julissa, and Tiffany's boy friend, Larry Key.

At the beginning of November, 2006, Jessica and Caroline obtained restraining orders against the defendant, in part based on Jessica's statements that the defendant had made threatening comments to her about hurting her and members of her family. The defendant then moved to a nearby apartment building where he obtained a job as the building superintendent.  Despite the restraining order, Jessica continued to spend time with the defendant.  She had keys to his apartment, kept some clothes there, and sometimes stayed overnight; she and her brother used the laundry facilities in the building.

Jessica and her family returned to New York to visit other relatives over the Christmas holiday; the defendant made several telephone calls to her during that period, expressing anger that he had not been included in the visit and asking to see Jessica. She refused his requests. The family returned to Springfield after the New Year.

On the evening of January 7, 2007, Jessica, her mother, brother, aunt, cousins, and her cousin's boy friend were in the

Warner Street apartment.  Shortly before 9:30 P.M., the defendant called Daniel's Nextel cellular telephone, asking to speak with Jessica.  The Nextel device had a "walkie talkie" feature that allowed everyone in the vicinity to hear the caller even if the device was not picked up and answered.  Daniel did not answer; the defendant telephoned again a few minutes later, asking to speak with Jessica and sounding angry.  Again, Daniel did not answer.

Soon thereafter, around 9:30 P.M., there was the sound of glass shattering, and several family members heard a scream.  They ran into the kitchen and saw the defendant approaching from the dining room, which led directly into the living room where the window was broken.  A number of family members testified that the defendant was holding some kind of a bottle or container, about the size of a one-gallon milk container.  Some said he was squirting or spraying liquid from it; others said he had a gasoline can with a funnel; and another saw him waving his arms but did not see if he had anything in his hands.  The family members ran into the middle of three bedrooms and locked the door.  They then realized that Julie Ann was not with them, and heard her scream and cry out, "Oh, my god." Jessica, Daniel, and Larry ran through a door between the middle and front bedrooms, then through another door leading from the front bedroom to the front hall.  They saw the defendant, whose leg

was on fire, struggling to unlock the front door; he managed to get the door open and left the house.

At that point, Julie Ann's bedroom, next to the kitchen, was on fire. The family saw Julie Ann walking slowly toward them from the living room to the front door. The back of her nightgown was in flames. She walked out onto the porch, where Jessica and Daniel tried unsuccessfully to extinguish the flames with their hands and a towel. Eventually, Jessica grabbed a comforter from one of the bedrooms and wrapped Julie Ann in it, which extinguished the fire.

When police arrived, the house was on fire, and there was a fire burning in the yard. Julie Ann was lying on the front porch, wrapped in the comforter, and various family members were standing on the porch, "hysterical beyond control," according to one of the first officers to arrive on the scene, and initially unable to explain what had happened. Directed to the comforter, one officer then unwrapped a flap and looked inside. Julie Ann's burns were so severe that he was at first unable to tell if she was male or female, but she later responded to questions. She was transported by ambulance to a hospital in Boston. Family members told police that the defendant had started the fire and had headed down Longhill Street, towards his apartment, after he left their house. Four officers (three Springfield police officers and a State police trooper) drove to Longhill Street in

a police cruiser to search for the defendant.  The officers stopped not far from his apartment complex to discuss their strategy for searching the complex and saw the defendant walking toward them, with his hands in the air, saying a number of times, "I'm right here.  I'm the one that started the fire.  I'm the one you're looking for."  They aimed their weapons at the defendant and told him to lie on the ground.

The officers noticed that the defendant's hands and face were seriously burned, and he smelled of gasoline.  He was walking slowly and "gingerly" and was in evident pain; in the course of handcuffing the defendant, officers observed that his legs also were burned badly.  He said repeatedly, "I didn't mean to hurt anybody."  While the defendant was being frisked for weapons, one of the officers found money and a book of matches in the left front pocket of the defendant's pants.  The officer held the matches up to show them to the other officers, saying, "Look what I found," and the defendant responded, "That's what I used to start the fire.'"

As the defendant continued to make statements to the arresting officers, Springfield police Officer Phil McBride gave the defendant the Miranda warnings.  McBride asked the defendant if he understood the rights he had been given, and the defendant said that he did.  The defendant repeated a number of times that he had not meant to start the fire and had not meant to hurt

anyone. When the defendant continued to speak, McBride told him to stop talking. The defendant also said a number of times that his legs were badly burned, he was in pain, and he wanted medical attention. After officers told him that an ambulance had been summoned, the defendant asked a number of times when it would arrive. The defendant continued to make statements to the officers until he was placed in the ambulance. As the defendant was being taken to the ambulance, one of the officers in close proximity to the defendant remarked that the defendant smelled of gasoline, and the defendant again said, "That's what I used."

Police searched the victim's apartment with an accelerant-detecting dog. The dog alerted to areas on the dining room floor, the floor in the hallway outside the bathroom, the living room floor, and the window sill below the broken window in the living room. A police laboratory confirmed that these areas tested positive for gasoline. Officers also found a burned and melted red plastic gasoline container in the rear bedroom, and a black plastic nozzle that tested positive for gasoline in the living room. They saw a white plastic bottle in the dining room, but did not remove that bottle for testing. The defendant's clothes -- jeans, T-shirt, shirt, belt, socks, and shoes -- tested positive for gasoline. A search of the defendant's apartment revealed a red plastic gasoline container in the front hall closet.

2.  <u>Defendant's testimony from first trial</u>.  The defendant did not testify in his own defense, as he had at his first trial.  The defendant's testimony from the first trial, however, was read in evidence by the Commonwealth.  In that testimony, the defendant said that, despite the restraining order, he and Jessica continued their relationship through December, 2006; she had keys to his apartment, and she spent some nights there.

The defendant said that, on the evening of January 7, 2007, he had locked his telephone and his keys in his apartment when he was called to fix a "flood" in another apartment in the building; when he discovered he was locked out, he called Daniel from a Nextel telephone, not his own, because Jessica had a set of keys to his apartment.  Jessica told him to come pick up the keys at the Warner Street apartment, where she was staying.  When the defendant arrived there and rang the doorbell, no one answered.  He stood outside smoking, and then "banged" on the window next to the door, which broke.  He removed the glass, called for Jessica, went inside, and walked through the living room into the dining room, with the lit cigarette.  The lights were off in those rooms, and he did not see anyone, but there was light coming from the kitchen.  When he found no one in the kitchen, he headed to the rear bedroom that he had shared with Jessica.  When he entered that room, he was confronted by the victim, who said, "This shit is going to stop," and threw

gasoline in his face from a red gasoline can. The defendant still had the cigarette in his mouth, and the gasoline ignited. His hearing "completely left," he banged into the door behind him, and the flames spread to the victim's nightgown. The defendant threw the gasoline can to the left side of the room and pulled the victim out of the room, as the fire became "intense." They moved from the kitchen into the dining room, where the victim "shunned" the defendant off. He headed through the dining room to the front door, where he struggled with the door lock because his hands were burned and he was unable to feel them. The defendant finally opened the door, pulled off and dropped the burning sweatshirt he was wearing, ran down the stairs and rolled in the grass to put out the remaining flames, and then ran across the street and continued running down his own street. He lost consciousness for a few minutes, and woke up lying in the grass, hearing Jessica screaming. He looked up to see police standing over him, and told them that he had been involved in a fire at the victim's apartment, and that someone there was badly burned and needed help. The defendant denied walking up to the officers with his hands in the air, or making any of the incriminating statements. While he was still lying on the ground, police told him to put his hands behind his back "for safety measures," searched him, and took cigarettes, matches, and his wallet from his pocket.

     *Discussion*.  1.  *Admission of defendant's statements*.
Prior to his first trial, the defendant moved unsuccessfully to
suppress his statements to police on January 7, 2007, arguing
that he had not been advised properly of his Miranda rights.
The defendant did not raise any argument concerning the
suppression motion in his prior direct appeal, and, after its
own review of the suppression issue pursuant to G. L. c. 278,
§ 33E, this court stated that it had not identified any issue
with the admission of the defendant's statements.  See
Commonwealth v. Bell, 460 Mass. 294, 298 n.10 (2011).

     The defendant filed a new motion to suppress prior to his
second trial, arguing that his statements both before and after
Miranda warnings were given should have been suppressed because
he did not knowingly and intelligently waive his Miranda rights
and because his statements were not voluntary.  The defendant
argued that he was intoxicated from alcohol and marijuana,
confused and in an "altered" mental state due to carbon monoxide
inhalation from the fire, and, most significantly, his mental
functioning was severely impacted because he was in
extraordinary pain from second and third degree burns and smoke
inhalation injuries.  The second trial judge held an evidentiary
hearing over two days at which the defendant's medical records
were admitted, expert medical testimony by the defendant's
expert was introduced on the degree of pain the defendant would

have been experiencing and its effect on his mental acuity. Two of the arresting officers also testified as to the defendant's obvious pain during his arrest and while awaiting an ambulance. The judge then denied the motion to suppress.

In reviewing the denial of a motion to suppress, we defer to the motion judge as to the weight and credibility of the evidence. See Commonwealth v. Hoyt, 461 Mass. 143, 148 (2011). We accept the motion judge's findings of fact unless they are clearly erroneous, see Commonwealth v. Durand, 457 Mass. 574, 596 (2010), and assess the correctness of the judge's legal conclusions de novo. See Commonwealth v. Baye, 462 Mass. 246, 255-256 (2012). We rely on the second motion judge's findings of fact about the defendant's mental and physical condition at the time of his arrest, and the conduct of the arrest; the facts as found are supported by the testimony at the two-day hearing.

After police were told that the defendant had started the fire and had been heading toward Longhill Street when he left the house, four officers drove their cruisers the short distance to that street and parked near the defendant's apartment building. While they were discussing how best to approach the building, they saw the defendant heading towards them, holding his hands in the air. The officers drew loaded weapons, pointed them at the defendant, and ordered him to the ground, where he was handcuffed and searched for weapons. He moved slowly and

gingerly while walking, and got down on the ground slowly and cautiously. When the officers conducted a patfrisk, the defendant had difficulty moving himself due to his injuries, and the officers physically rolled him from side to side to complete the patfrisk. When bystanders started to appear, the defendant was escorted to a police cruiser, still handcuffed, with officers holding him on either arm, and moved from the scene of the arrest to await the arrival of the ambulance.

The defendant's medical records[5] indicated that he suffered second degree burns on his face and lower legs, second and third degree burns on his hands, and third degree burns on his upper left leg.[6] His corneas were damaged from exposure to flames, and, due to smoke inhalation, there was soot in his nose. He had inhaled toxic fumes, including carbon monoxide and cyanide.[7] Even after having been administered morphine, the defendant reported to medical personal later that evening that his pain level was a ten out of ten. The medical expert testified that being handcuffed with his hands behind his back, and being

---

[5] From January 7, 2007, through January 29, 2007, the defendant was treated in the same specialized burn unit in a Boston hospital as was the victim.

[6] At his first trial, a year after the fire, the defendant's hands were still being treated and both hands were wrapped in bandages.

[7] Photographs of the defendant's injuries were admitted in evidence.

moved, would have exacerbated the severe pain the defendant was experiencing. The defendant told police repeatedly that he was in pain, and the officers testified it was evident that touching and moving him caused additional pain. The defendant asked numerous times when the ambulance would arrive, and appeared anxious to obtain medical assistance.

Extrapolating from the level measured at the hospital, the defendant's blood alcohol level when he made the statements to police would have been .115, which the judge described as approximately one and one-half times the legal limit of .08 for operating a motor vehicle. The medical expert testified that that level of intoxication may affect an individual's ability to make rational decisions. The defendant's urine also testified positive for marijuana. The expert testified that inhalation of carbon monoxide affects the processing of oxygen in the blood, depriving the brain of oxygen, which can cause confusion and impaired reasoning. Cyanide also impairs an individual's thought processes. The effects of carbon monoxide inhalation still would be expected one-half hour after inhaling the gas, the time at which the defendant encountered the officers. The expert opined that the defendant's burns were "severe distracting injur[ies]," and that a physician would be unable to rely on the accuracy of information reported by a patient with distracting injuries because the patient's mind would be focused

on the pain from the injury.

In his first motion to suppress before his first trial, the defendant raised the issue of the effect of the burn injuries, but did not raise any issue concerning the effects of carbon monoxide and cyanide on his ability to make a knowing, voluntary, and intelligent waiver of his Miranda rights, and to give a voluntary statement. The first trial judge denied the motion after having determined that the Miranda warnings were adequate, the defendant was not in custody when he made his initial statement to police, and the pain from his injuries did not result in the defendant's statements not being voluntarily made. Although the Commonwealth argued at the hearing on the defendant's second motion to suppress that the second trial judge should not conduct a new evidentiary hearing, and should rely on the first judge's findings as to the degree of pain from the burn injuries, the second judge considered anew the question of the burn injuries.

The second judge concluded that the defendant was in custody when he made the statements to police. The Commonwealth does not dispute that the defendant was in custody when he was ordered to the ground. The judge concluded further that the defendant was not subjected to interrogation or coercion, and the statements were spontaneous. The defendant knew he was speaking to police, and appeared eager to do so; while many of

his statements were made in an effort to obtain medical care, police told him almost immediately that an ambulance had been requested, and did not suggest that receiving medical care was in any way dependent on the defendant making further statements. Indeed, rather than attempting to question the defendant, one of the officers gave him the Miranda warnings and several times told him to stop talking.

Having concluded that the statements were not the subject of interrogation or coercion, the judge focused on the question of voluntariness. The judge determined that, while the defendant was clearly in pain and suffering from significant injuries, and may have been confused by alcohol or the inhalation of carbon monoxide, his injuries did not preclude him from making a voluntary statement. His statements to police, and his actions after the fire, demonstrated awareness of the situation at the scene of the fire, and did not show any great confusion. Despite the defendant's high blood alcohol level, the arresting officers did not notice any slurred speech, stumbling, or other signs of intoxication. Emergency medical personnel recorded that he was "alert and oriented," and able to answer questions concerning his injuries and his medical history; his medical records stated that he was "cooperative and alert" on arrival at the hospital.

The defendant argues that his statements were not voluntary

in part due to his consumption of alcohol and the effects of his inhalation of toxic fumes, but also, largely due to the pain from his burn injuries.  A statement is voluntary if it is the product of a rational intellect and a free will.  Commonwealth v. Bins, 465 Mass. 348, 360 (2013) (citation omitted).  For a statement to be voluntary, "the Commonwealth must prove beyond a reasonable doubt that 'in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was [not] overborne,' but rather that the statement was 'the result of a free and voluntary act.'" Commonwealth v. Baye, 462 Mass. at 256, quoting Commonwealth v. Durand, supra at 594-596.

"Statements that are attributable in large measure to a defendant's debilitated condition, such as . . . drug abuse or withdrawal symptoms, [or] intoxication . . . are not the product of a rational intellect or free will and are involuntary" (citations omitted).  Commonwealth v. Allen, 395 Mass. 448, 455 (1985).  Nonetheless, an "otherwise voluntary act is not necessarily rendered involuntary simply because an individual has been drinking or using drugs."  Commonwealth v. Brown, 462 Mass. 620, 627 (2012), quoting Commonwealth v. Silanskas, 433 Mass. 678, 685 (2001).  See Commonwealth v. Shipps, 399 Mass. 820, 826 (1987).  That a defendant is suffering from a serious and painful injury, such as a bullet or knife wound, does not

necessarily preclude a statement being made voluntarily.  See Commonwealth v. Stroyny, 435 Mass. 635, 646-647 (2002) (statement to nurse and police officer voluntary although defendant was being treated for slashed wrists and was crying and moaning in pain); Commonwealth v. Clark, 432 Mass. 1, 12 (2000) (statement to police voluntary although defendant was suffering from newly received gunshot wounds to head and arm).  Even where one or more factors could suggest that a statement may have been made involuntarily, see Commonwealth v. Selby, 420 Mass. 656, 664 (1995), or that a defendant was in a disturbed emotional state, see Commonwealth v. Perrot, 407 Mass. 539, 543 (1990), that does not automatically render the statement involuntary.  Id.

A determination whether the Commonwealth has proved beyond a reasonable doubt that a statement is voluntary is made in light of the totality of the circumstances, including, inter alia, the "conduct of the defendant, the defendant's age, education, intelligence and emotional stability, . . . physical and mental condition, . . . and the details of the interrogation, including the recitation of Miranda warnings." Commonwealth v. Hilton, 450 Mass. 173, 177 (2007), quoting Commonwealth v. Mandile, 397 Mass. 410, 413 (1986).  We discern no error in the second motion judge's conclusion that, notwithstanding his serious injuries and his consumption of

intoxicants, the defendant knowingly, intelligently, and voluntarily waived his Miranda rights, and spoke voluntarily to police, continuing to talk despite their statements that he should stop talking.  The defendant's coherent and appropriate responses to medical personnel, his evident understanding that Julie Ann had been seriously injured and his efforts to get help for her, and his statements to police about the fire and his own injuries indicate a rational understanding of the situation and a voluntary decision to speak to police.

2.  Admission of graphic photographs.  The defendant argues that the admission of six photographs of the victim, taken while she was being treated in the hospital, was an abuse of discretion, and that the photographs were irrelevant to prove extreme atrocity or cruelty, as the extent and severity of the victim's burns was evident from other, extremely graphic, trial testimony, and the photographs were highly inflammatory.

A determination whether particular graphic photographs may be admitted is within the sound discretion of the trial judge.  Commonwealth v. Stockwell, 426 Mass. 17, 20 (1997).  "[I]f the photographs possess evidential value on a material matter, they 'are not rendered inadmissible solely because they are gruesome [or duplicative] or may have an inflammatory effect on the jury.'"  Commonwealth v. Keohane, 444 Mass. 563, 573 (2005), quoting Commonwealth v. Ramos, 406 Mass. 397, 407 (1990).  The

trial judge must exercise his or her discretion to "determine whether the inflammatory nature of a photograph outweighs its probative value."  See Commonwealth v. Cardarelli, 433 Mass. 427, 431 (2001), citing Commonwealth v. Vizcarrondo, 431 Mass. 360, 362 (2000).  While a defendant bears a "heavy burden" to show an abuse of that discretion, "special caution is warranted" in some circumstances, such as where the body has been altered after the injuries were inflicted.  See Commonwealth v. Cardarelli, supra, citing Commonwealth v. Bastarache, 382 Mass. 86, 106 (1980).  See, e.g., Commonwealth v. Keohane, supra at 573-574; Commonwealth v. Jackson, 428 Mass. 455, 464-465 (1998).  "If the judge determines, after careful assessment, that photographs depicting an altered body are apt to be inflammatory or otherwise prejudicial, he [or she] should exercise his [or her] discretion to admit them only if they are important to the jury's resolution of any contested fact in the case."  Commonwealth v. Cardarelli, supra.

The prosecutor proffered twelve photographs in conjunction with her motion to allow the introduction of what she described as "horrific" photographs.  Describing the photographs as "gruesome," the defendant objected, and the trial judge conducted a hearing on the motion.  The judge allowed the admission of six of the twelve proffered photographs, two taken at the emergency room where the victim was first transported,

and four taken while she was undergoing treatment at a Boston medical center. The judge also allowed, over the defendant's objection, introduction of a photograph of the victim before her injuries. During the hearing, the judge decided the photographs were sufficiently disturbing that the members of the venire were informed during voir dire that the trial would include the introduction of "graphic" photographs; in response to their answers, some members of the venire were asked at sidebar about their ability to decide the case fairly and impartially in light of the planned introduction of the graphic photographs. In his charge, without specific reference to the photographs, the judge gave a general instruction that "[e]motion or sympathy, passion or prejudice have no place in your deliberations."

The photographs are indeed graphic and disturbing. One shows the victim's severely burned, swollen, and distorted face, with various tubes attached, while she was being treated in the emergency room. Several show the victim's legs, and other parts of her body, that had been sliced open in multiple locations as part of surgery performed to relieve swelling. Another shows her face and head, almost entirely covered in bandages, with a breathing tube protruding from the bandages.

The Commonwealth is entitled to a full presentation of its case. See Commonwealth v. Keohane, supra at 573; Commonwealth v. Bradshaw, 385 Mass. 244, 269-270 (1982). Here, because the

Commonwealth proceeded on all three theories of murder in the first degree, it bore the burden of establishing that the killing had been done with extreme atrocity or cruelty. The admitted photographs are relevant; they clearly bear on the question of the pain the victim suffered as a result of the burns, and the fact that extensive testimony had been introduced describing the injuries and the victim's suffering would not, alone, preclude the introduction of graphic photographs. See Commonwealth v. Ramos, supra. Nonetheless, to be admissible, the probative value of the evidence must not be substantially outweighed by its prejudicial effect. See Mass. G. Evid. § 403 (2015). See also Commonwealth v. Toro, 395 Mass. 354, 358 (1985).

"[E]ven relevant evidence may not be admitted if 'its probative value is substantially outweighed by the danger of unfair prejudice.'" Commonwealth v. Carey, 463 Mass. 378, 387-388 (2012), quoting Mass. G. Evid. § 403 (2012). The judge clearly was cognizant of the concern that these photographs were highly disturbing and there was a risk that they might be too prejudicial. The prosecutor was equally aware of that concern, as is evident from the discussion at the hearing on the motion to introduce the photographs. Defense counsel pointed out that all of the photographs involved medical procedures, rather than showing the injuries inflicted. He also argued that the victim

had been on a monitored pain management program, so that the injuries as seen in the photographs did not reflect the level of pain she actually experienced, particularly where she was unconscious during much of her hospitalization.  In addition, defense counsel commented that the trial already was going to be extremely "emotional" and the photographs were unduly prejudicial and would serve only to "sway the jury by emotionality" and be a "distraction" from their duty.  The judge then allowed the introduction of six of the photographs to establish extreme atrocity or cruelty.

"[E]vidence that poses a risk of unfair prejudice need not always be admitted simply because [it is admissible]; the judge still needs to weigh the probative value of the evidence and the risk of unfair prejudice, and determine whether the balance favors admission."  Commonwealth v. Gray, 463 Mass. 731, 753 (2012), quoting Commonwealth v. McCowen, 458 Mass. 461, 479 n.15 (2010).  "[A] judge's discretionary decision constitutes an abuse of discretion where we conclude the judge made 'a clear error of judgment in weighing' the factors relevant to the decision."  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), quoting Picciotto v. Continental Cas. Co., 512 F.3d 9, 15 (1st Cir. 2008).

All of the proffered photographs showed medical intervention and medical equipment.  They depicted, in large

part, graphic aspects of the victim's injuries as a result of medical procedures while the victim was being treated at the hospital. See Commonwealth v. Bastarache, supra at 105-106. The photographs were indeed disturbing, and had a tendency to arouse the jury's emotions. "[T]rial judges must take care to avoid exposing the jury unnecessarily to inflammatory material that might inflame the jurors' emotions and possibly deprive the defendant of an impartial jury." Commonwealth v. Berry, 420 Mass. 95, 109 (1995).

While it is a close call, and we might have reached a different result had the question been de novo before us, we are unable to conclude that the judge abused his discretion in deciding to allow the introduction of the photographs.

3. Exclusion of one of defense counsel's closing arguments. The theory of the defense was that police officers did not conduct an adequate investigation of the events of January 7, 2007. Defense counsel claimed that the officers were so affected by the victim's injuries that they focused only on the defendant and disregarded or did not seek other evidence that would have supported his claims that the victim, not the defendant, threw the gasoline; that the gasoline might have come from someone who lived in another apartment in the building; that police did not attempt to determine the source of the gasoline; that someone else in the building might have owned the

gasoline can; or that the fire was not intentional.

In closing, defense counsel emphasized that officers did not collect a white plastic bottle found on the dining room floor in the victim's apartment; did not bring the accelerant detecting dog into the back bedroom where an investigator concluded that the fire had started, or into the back hall or the back stairs that were shared with other apartments in the building; and did not have the dog search the perimeter of the house to determine whether there were traces of gasoline. Defense counsel argued also that the family was confused and saw the defendant as he was leaving the house, not as he entered. Counsel contended that the defendant had a bottle of drain cleaner in his hand (from his job maintaining his apartment building), not gasoline. Counsel suggested also that family members inadvertently influenced each other's statements to police, by discussing the events at the police station while waiting to be interviewed. All of these arguments were permissible based on evidence introduced at trial.

Defense counsel argued also that officers had moved, repositioned, or "planted" a gasoline can found in a closet in the defendant's bedroom in an effort to implicate the defendant. Counsel based this argument on the fact that photographs taken at different times during the night and morning following the execution of a search warrant for the defendant's apartment

showed the gasoline can facing in different directions.[8]  Arguing that it was an extension of the inadequate police investigation, defense counsel claimed that the police photographer who took the photographs in the early morning hours after the fire had moved or planted the gasoline can.[9]  The prosecutor objected. The judge allowed the objection and ordered that part of the argument struck.  In ordering the statements struck, the judge instructed the jury to

> "disregard that argument.  It's improper for counsel to make an argument based purely on speculation.  There's been no testimony that gasoline was planted.  It is an improper argument.  You will disregard it."

After a hearing the following morning on the defendant's motion to reargue, defense counsel offered evidence in support of his position, including pointing to the different direction the can was facing in different photographs.  The judge commented that, presented in that fashion, the argument might have been acceptable, but not in the form that defense counsel

---

[8] The police photographer testified that he may have inadvertently replaced the can incorrectly after it was moved during the course of the search.

[9] Counsel described the law enforcement investigation as "grossly incompetent", pointing out that police did not collect the white bottle from the area where the dog had alerted in the dining room.  Counsel then stated that officers entered the defendant's apartment "under the dead of night," before they had obtained the search warrant, and that officers "snuck into [the defendant's] apartment so they could . . . put a gas can there." Counsel argued that one of the photographs showed the gasoline can before officers decided where to place it.

had presented it to the jury. In denying counsel's motion, the judge commented to counsel that it "completely eluded me that you were intending to argue the gas can had been placed, and in fact it still does." The judge concluded that counsel's argument was impermissible because it relied on matters not in evidence, misstated the evidence, invited the jury to speculate beyond the evidence, and contained counsel's own opinions as to the credibility of certain witnesses. The judge determined that the inferences that counsel suggested the jury make were not reasonable, and that the argument that the police photographer had moved or planted the gasoline can was improper.

As presented in counsel's argument to the jury, we agree. See, e.g., Commonwealth v. Johnson, 463 Mass. 95, 114 (2012), and cases cited (closing arguments must be limited "to facts in evidence and the fair inferences to be drawn therefrom"). The officer testified that the gasoline can had been moved during the search, and that he might have placed it back in a different position for the photograph. There was absolutely no evidence, however, that police engaged in any planting of evidence in an effort to implicate the defendant.

4. Relief pursuant to G. L. c. 278, § 33E. The defendant did not seek a reduction in the verdict or other relief pursuant to G. L. c. 278, § 33E. Nonetheless, we have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E.

Although the defendant raises no issue in this regard, we have considered carefully whether there was sufficient evidence to support a conviction of felony-murder, with armed home invasion as the predicate felony.  The jury found that, after breaking into the victim's apartment, the defendant threatened imminent harm to Jessica, her brother, Key, and her aunt Caroline.[10] Viewing the evidence in the light most favorable to the Commonwealth, we conclude that there is sufficient evidence to support this finding.[11]  We discern no reason to reduce the

---

[10] At his first trial, the defendant was acquitted of assault and battery by means of a dangerous weapon (gasoline) against Key, the Commonwealth filed a nolle prosequi on two charges of assault by means of a dangerous weapon against Julie Ann and Tiffany, and the first trial judge allowed the defendant's motion for entry of a required finding of not guilty on a charge of assault and battery by means of a dangerous weapon against Julissa.  See note 1, supra.  At the outset of the defendant's second trial, the Commonwealth acknowledged that the felony-murder charge could be supported only on a finding of armed home invasion by means of a threat, not an actual use of force.

[11] Jessica testified that, when she first saw the defendant in the entrance between the kitchen and the dining room, he was angry, talking in a loud voice, and "charging" at her; she thought he was "coming after" her and intended to hurt her, but no one else.  She turned and ran.

Key testified that, when the defendant was standing in the entrance between the two rooms, he was in a "rage," "upset," and "loud," saying, "I got you.  I got you.  You think it's a joke now."  Key tried to position himself between the defendant and the other family members, who were heading into the room where Jessica had gone.  Key also testified that the room in question was Caroline's room.  Caroline was in the room, and, when everyone was inside it, Caroline was holding the door closed so the defendant could not enter.

verdict of murder in the first degree or to order a new trial.

<u>Judgment affirmed</u>.

---

In addition, Key testified that the defendant was spraying gasoline with a bottle he was carrying, sprayed some at Key, and some of that gasoline landed on Key's shirt.  Testing of the shirt before the defendant's first trial, however, revealed no evidence of gasoline, and, at that trial, the defendant was acquitted of assault and battery by means of a dangerous weapon for spraying Key with gasoline.  See note 10, <u>supra</u>.