NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11657

COMMONWEALTH  vs.  RAFAEL MARTINEZ.


Essex.     September 9, 2016. - January 5, 2017.

Present:  Gants, C.J., Botsford, Gaziano, Lowy, & Budd, JJ.


Homicide.  Evidence, Videotape, Relevancy and materiality,
     Inflammatory evidence, Consciousness of guilt.  Practice,
     Criminal, Capital case, Redaction, Voir dire, Opening
     statement, Argument by prosecutor.



     Indictment found and returned in the Superior Court
Department on June 29, 2011.

     The case was tried before Timothy Q. Feeley, J.


     Amy M. Belger for the defendant.
     Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.


     GAZIANO, J.  The victim, Timothy Walker, was shot while

seated and talking with two friends on the porch of his

grandmother's house in the Tower Hill section of Lawrence.

Despite two eyewitnesses, and surveillance video recordings of

the incident obtained from nearby businesses, police were unable

to identify a suspect. Nine months after the victim's death, a local television station featured the shooting in an "unsolved crime" series news broadcast that included portions of the surveillance footage showing the suspect, whose face was not discernable. The defendant watched the news broadcast with his girl friend's mother and told her that he had been the shooter. At the defendant's trial, the Superior Court judge allowed the admission in evidence, over the defendant's objection, of a redacted version of the news broadcast. The jury convicted the defendant of murder in the first degree on a theory of deliberate premeditation.

On appeal, the defendant's principal argument is that the news broadcast should not have been admitted in evidence, or, alternatively, that it should have been more heavily redacted, because much of it was irrelevant, inflammatory, and highly prejudicial. The defendant also claims error in certain aspects of the judge's conduct of the voir dire of the venire and two of the judge's evidentiary rulings. Finally, the defendant contends that several statements in the prosecutor's opening statement and closing argument were improper.

We conclude that there was no abuse of discretion in the judge's decision to allow admission of the news broadcast, and no error requiring reversal in the defendant's other challenges. Having carefully examined the record pursuant to our duty under

G. L. c. 278, § 33E, we discern no reason to order a new trial or to reduce the degree of guilt. We therefore affirm the defendant's conviction.

1. Facts. We recite the facts the jury could have found, reserving other facts for our discussion of specific issues. On July 24, 2010, while the victim was sitting on the porch of his grandmother's house with his cousin and a friend, a man approached the porch, shot the victim in the head with a shotgun, and then fled back the way he had come, shooting as he ran.[1] The shooter was wearing a dark baseball cap pulled low over his face, and neither eyewitness was able to identify him, although each gave a similar description of his height, build, complexion, and clothing. The victim died of his injuries several days later. In the months following the shooting, police were unable to identify a suspect.

The shooter's movements immediately before and after the shooting were captured by four security cameras located at nearby business establishments. The edited footage constituted an approximately four and one-half minute video recording, which was admitted and played for the jury. This video recording showed an automobile arrive in the vicinity of the crime and stop for several minutes. During that time, the shooter got out

---

[1] As the gunman approached the victim, he said, "Here, this is for you, nigger."

of the passenger's side of the vehicle, approached the victim, fired a weapon, ran back toward the vehicle, and entered the passenger's side, upon which the vehicle was driven away.

In the spring of 2011, the defendant was dating Tesseana Wilson and stayed frequently at the home of her mother, Michelle Wilson,[2] up to five nights per week.[3] Approximately nine months after the shooting, on the evening of May 2, 2011, sometime between 11 and 11:30 P.M., the defendant walked into the living room where Michelle was watching television and asked her to change the station to a particular channel. She did so. The station was airing the first broadcast of a new unsolved crime series; the program that evening was titled, "Who Killed Timothy Walker?" Michelle recognized the name "Timothy Walker" as a "distant cousin" of her children, whom she knew had been shot the previous summer.

The defendant watched the broadcast with Michelle. While they were watching, she looked at the defendant and said, "That's you" or "Is it you?," while he said, "I killed him." The defendant thereafter described his actions, narrating events as they were shown on the surveillance footage. When Michelle

---

[2] Because Tesseana Wilson and her mother, Michelle Wilson, share a last name, we refer to them by their first names.

[3] The defendant was living at the home of Dolores Regan. Delores was the mother of the defendant's friend, Max Regan, with whom he had attended high school and played football. To avoid confusion, we refer to them as "Delores" and "Max."

asked him why he was shooting as he ran from the scene, the defendant said that he had been concerned that he would be shot at or pursued. At another point in the broadcast, when the victim's mother described being told of her son's death, the defendant said that she was incorrect in stating that the bullet had passed through the victim's head, because he had used a hollow-point bullet. The defendant also described the actions of the getaway vehicle's driver, and his own efforts to conceal evidence of the crime.

Michelle told the defendant to tell Tesseana and then to leave her house. The defendant spoke with Tesseana privately, telling her that he had been the shooter, and Michelle then drove him to a house in Lawrence where he had requested to be taken. Shortly thereafter, in the early morning hours of May 3, 2011, Tesseana watched a rebroadcast of the news program and recognized the shooter's walk and build as the defendant's. Later that day, Michelle contacted police and told them of the defendant's confession. Police also spoke with Tesseana, who initially denied recognizing the shooter on the news broadcast. She later said that she had recognized the defendant, but did not want to believe it was him, and described her conversation with the defendant.

Four days after the news broadcast aired, on Friday, May 6, 2011, police went to Dolores's house; Max was home and spoke

briefly with them.  Later that day, Max gave the defendant a ride home and noticed that the defendant was holding a pair of sneakers.  When they arrived at the house, the defendant asked Dolores for a plastic bag, which she gave him.  Max later drove the defendant to a bridal shower; en route, Max asked the defendant why the police had been at the house looking for him. The defendant explained that a friend of his from Lawrence had shot a gun into the air and then had dropped it, and that the defendant had picked it up; he said that the police probably wanted to ask why his fingerprints were on the gun.

The next day, Saturday, when taking out the trash,  Dolores noticed the bag containing the sneakers in an otherwise empty trash can.  On Sunday, she contacted police and gave them the sneakers.  Max also identified them as those the defendant had with him while in Max's vehicle on May 6.

2.  Discussion.  The defendant challenges the introduction of the redacted recording of the news broadcast, the judge's decision not to conduct a voir dire of the venire concerning the news broadcast, the judge's evidentiary rulings with respect to Max's testimony, and several of the prosecutor's remarks in his opening statement and closing argument.  We address each argument in turn.

a.  The news broadcast.  The defendant argues that the audio-video recording of the news broadcast should not have been

admitted in its redacted form; he contends that it should have been excluded, or more heavily redacted, on the ground that much of the content was irrelevant, highly inflammatory, and unduly prejudicial. Because the defendant objected to the introduction of the recording, we review to determine whether any abuse of discretion resulted in prejudicial error. See Commonwealth v. Rosa, 468 Mass. 231, 239-242 (2014).

A judge has broad discretion in making evidentiary rulings. Commonwealth v. Bell, 473 Mass. 131, 142 (2015), cert. denied, 136 S. Ct. 2467 (2016). In determining whether the judge erred in allowing introduction of the redacted recording,[4] we consider whether the judge took "care to avoid exposing the jury unnecessarily to . . . material that might inflame [their] emotions and possibly deprive the defendant of an impartial jury." Commonwealth v. Berry, 420 Mass. 95, 109 (1995). This analysis requires us to review the redactions themselves, the limiting instructions, and the probative value of the news broadcast in light of its likely prejudicial effect. Bell, supra at 142-143.

We conclude that there was no abuse of discretion in allowing the introduction of the redacted recording, given its

---

[4] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Mass. G. Evid. § 403 (2016).

significant probative value, the redactions made, and the judge's instructions before the recording was played for the jury and during his final charge.

    i.  Redactions.  The four-minute and twenty-second news broadcast, asking for the public's assistance in locating a killer, was narrated by a station news reporter.  It contains his introductory and closing comments, the surveillance video footage of the shooter approaching and running from the scene of the shooting, statements made during an interview by the district attorney, statements from the victim's mother, and photographs of the victim and his belongings.

The judge conducted several hearings during the first two days of trial on the Commonwealth's motion in limine to introduce the recording.  After having viewed the recording several times, the judge provided the parties with a document dividing the news broadcast into twenty-one segments, setting forth his ruling as to each.  He ordered audio redaction in a number of segments, and, in one section, both audio and video redactions.  The audio portion was muted approximately fifteen times, for a total of two minutes and five seconds (approximately forty-eight per cent of the recording) to prevent the jury from hearing statements by the district attorney, some of the narrator's comments concerning the victim and the crime, and certain comments by the victim's mother.  A ten-second

portion of the video recording was dark, and the audio was muted, to exclude a photograph of the victim's mother holding her son's hand in the hospital.

The redacted recording of the news broadcast was played for the jury during Michelle's testimony, immediately before she testified about the defendant's confession.  Before the recording was played, the judge gave a limiting instruction on the reasons for which the jury could consider the recording, the nature of the redactions (both audio and visual), and the reasons for the redactions (so that the recording the jury would "hear and see is admissible under our rules of evidence").

ii.  Probative value.  The defendant argued in his opposition to the Commonwealth's motion in limine to introduce the audio-video recording of the news broadcast that the recording included statements by police officers, "commentary" from the district attorney, and "heartfelt" pleas from the victim's family that "this crime must be solved," all of which would be unduly prejudicial and highly "inflammatory."  He also argued that the witnesses would be able to provide relevant context through their testimony, rendering the news broadcast unnecessary.  In addition, counsel argued that the quality of the announcer's voice was itself inflammatory.[5]

_____

[5] The defendant argued at the hearing that the announcer has a "voice like Gregory Peck, like the voice of God, on that

To be admissible, evidence must be both relevant and probative.  See Commonwealth v. Carey, 463 Mass. 378, 386-390 (2012).  While the audio-video recording of the news broadcast, as redacted, well may have tended to arouse an emotional response from the jury, that is not the extent of the question.  Even where relevant, evidence is not admissible if "its probative value is substantially outweighed by the danger of unfair prejudice" to the defendant.  Id. at 387-388, quoting Mass. G. Evid. § 403 (2012).  The Commonwealth, however, is "'entitled to present as full a picture as possible of the events surrounding the incident itself,' as long as the probative value of the evidence presented is not substantially outweighed by any prejudice to the defendant" (quotations omitted).  Commonwealth v. Hernandez, 473 Mass. 379, 394 (2015). See Commonwealth v. Robidoux, 450 Mass. 144, 158 (2007).

Here, the judge concluded that the audio-video recording was relevant and probative to support Michelle's testimony about the defendant's statements admitting to having been the shooter. Shortly before the broadcast aired, the defendant asked Michelle to turn to the channel on which it would air.  The defendant confessed to the shooting while he and Michelle watched the news broadcast.  During the broadcast, the defendant provided a

screen which is like being at a drive-in movie, it's just going to be so prejudicial and so inflammatory beyond belief."

detailed narrative of the events unfolding on the surveillance video footage, described his actions after the surveillance footage ended, and responded to Michelle's questions about his reasons for having undertaken some of the actions depicted. He then referenced the news broadcast in his confession to Tesseana. Within a few hours, she saw a rebroadcast of the news program and recognized the shooter's walk and build as the defendant's. This evidence was central to a case in which there was no physical evidence connecting the defendant to the shooting and no apparent motive, and the defendant's confessions to Michelle and Tesseana were at the heart of the Commonwealth's case.[6] Given this, we discern no abuse of discretion in the judge's conclusion that the redacted recording of the news broadcast was relevant and probative.

iii. Prejudicial effect. We turn to consider whether the judge erred in concluding that the probative value of the news broadcast was not substantially outweighed by its prejudicial effect. "Relevant evidence is not rendered inadmissible by its

---

[6] At the hearing on the motion in limine, the judge observed that "[the news broadcast] really is kind of integral to the development of the Commonwealth's case. You know, this has the unique set of circumstances [in] that while this was being televised live . . . the defendant is in a room with another person; and there is a conversation about this broadcast that includes, allegedly includes, admissions. . . . It's not just throwing the broadcast up there. It's throwing it up there in the context of an important conversation that occurred as a result of and during the course of the broadcast."

potential to arouse feelings of sympathy in a jury.  The evidence remains admissible if its probative value outweighs its potential for sympathy."  Commonwealth v. Mendes, 441 Mass. 459, 467 (2004).  In that case, we concluded that there was no abuse of discretion in the judge's decision to allow introduction of evidence that the victim, the defendant's wife, had been pregnant at the time of her death, because the evidence was not offered solely to garner sympathy for the victim or to cast the defendant in a bad light.  Id. at 468.  It was relevant to the defendant's state of mind and his relationship with his wife, which were relevant to establish his motive to kill her.  Id. See, e.g., Bell, 473 Mass. at 143-145 (no abuse of discretion in allowance of Commonwealth's motion to introduce "graphic" and "disturbing" photographs of victim receiving treatment for burn injuries, even where photographs "had a tendency to arouse the jury's emotions," because of their probative value on issue of extreme cruelty or atrocity).

In this case, the audio-video recording of the news broadcast was relevant to support Michelle's testimony about the defendant's confession to her while watching it, and was particularly probative given the absence of physical or eyewitness evidence, and the apparent lack of any motive.[7]

---

[7] The defendant argues that only the surveillance footage portion of the news broadcast should have been admitted because,

Because of the extensive redactions, the jury did not hear the most inflammatory portions of the broadcast. The victim's mother's remarks during the interview at her kitchen table, potentially highly inflammatory, were all muted, with the exception of her statement regarding the bullet penetrating her son's skull. This statement corroborated Michelle's testimony concerning the defendant's statement about the hollow-point bullet used. Although the news broadcast contained family photographs of the victim, they were of a type that we have deemed admissible at a murder trial. See Commonwealth v. Holliday, 450 Mass. 794, 816, cert. denied sub nom. Mooltrey v. Massachusetts, 555 U.S. 947 (2008) ("Commonwealth may properly tell the jury 'something of the person whose life [has] been lost in order to humanize the proceedings'" [citation omitted]).

Moreover, during cross-examination and in closing argument, the defendant relied on the recording of the news broadcast to support his theory that Michelle fabricated the confession to get the defendant out of the house and out of Tesseana's life.[8]

during their May 2, 2011, conversation, he and Michelle principally discussed the contents of the surveillance footage. Michelle testified, however, that the defendant also discussed the comment by the victim's mother about the victim's head wound. In addition, the broadcast, with its request for help in identifying the shooter, was airing in its entirety when the defendant decided to confess.

[8] For example, in closing, defense counsel argued:

The judge twice instructed the jury that they were not to consider any of the recorded statements for their truth. Immediately before the audio-video recording was played, the judge instructed the jury:

> "You may only consider the broadcast for a limited purpose.  You may not consider the statements that you hear for the truth of the matter asserted in those statements. You may only consider the statements you hear for the fact that they were made and as the context to permit you to understand certain testimony that you will then hear from this witness."

He reminded them of this instruction during his final charge.[9] He also instructed during his charge that the jury were not to base their decision "on sympathy, anger, passion, prejudice or pity for or against either party in this case."

"We presume, as we must, that a jury understand[] and follow[] limiting instructions."  Commonwealth v. Jackson, 384 Mass. 572, 579 (1981).  See Commonwealth v. Stegemann, 68 Mass.

---

"Ladies and gentlemen, I respectfully suggest to you that the only [way] to fairly evaluate and characterize Michelle Wilson's testimony during this trial is that she was evasive.  She got caught in [lies], which leads to one conclusion.  She was not telling the truth. . . .  And then on May 2nd, when there is a [network] [n]ews broadcast, she wants you to believe that all of a sudden, out of the blue, he volunteers a confession. . . .  Ladies and gentlemen, it's the confession of all confessions.  And, if it seems too good to be true, it's because it is."

[9] "As you will recall, I gave you an extensive limiting instruction about the [news] broadcast, prohibiting the use of that evidence for the truth of the matters asserted and limiting the use of that evidence for the purpose of providing context for other evidence that you heard from witnesses."

App. Ct. 292, 306 n.25 (2007) (presuming juries obey instructions "to base their verdicts solely on the evidence and to exclude emotion or sympathy for either side from their deliberations").

Further, the prosecutor did not seek to exploit the emotional effect of the audio-video recording.  His closing remarks about the news broadcast were limited to its effect on the defendant and the statements he made to Michelle while watching it ("when that video aired and [the defendant] was out there and he saw it, it came out.  It just all came flooding out").  See Holliday, 450 Mass. at 816 (prosecution did not emphasize or exploit emotional testimony elicited from family members of shooting victims).

In sum, while clearly prejudicial to the defendant, the record does not support a conclusion that introduction of the audio-video recording was unfairly prejudicial.  In light of the extensive redactions of the news broadcast, and the judge's limiting instructions, and given its significant probative value, the judge's decision to allow the jury to see and hear the redacted recording was not "a clear error of judgment in weighing the factors relevant to the decision, . . . such that the decision falls outside the range of reasonable alternatives."  Commonwealth v. Chatman, 473 Mass. 840, 846

(2016), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

b. Voir dire. The defendant argues that the judge abused his discretion by failing to question the members of the venire regarding the prejudicial impact of seeing the news broadcast at trial. On appeal, the defendant suggests that the judge, sua sponte, should have asked potential jurors "whether viewing media coverage of this exact case would affect their ability to be fair and impartial." We conclude that the judge was not required to make such an inquiry.

"The scope of voir dire rests in the sound discretion of the judge . . . ." Commonwealth v. Lopes, 440 Mass. 731, 736 (2004). It is well established that "the requirement for individual voir dire arises upon the defendant's request for such inquiry; it is not automatic." Commonwealth v. DiRusso, 60 Mass. App. Ct. 235, 238 (2003). See Commonwealth v. Kater, 432 Mass. 404, 412-414 (2000), and cases cited. See, e.g., Commonwealth v. Reavis, 465 Mass. 875, 888-890 (2013), and cases cited. Here, while the defendant did submit a request that the judge ask nineteen specific questions "on an individual basis," he did not request that any questions be posed with regard to the news broadcast.[10]

---

[10] The judge inquired of individual members of the venire whether the race of the defendant and the nature of the

The defendant argues on appeal that the audio-video recording was extraneous and that the judge therefore was required to conduct voir dire with respect it.  We do not agree.  Evidence that does not lie outside the record or that is "fully relevant and probative" of an issue at trial is not extraneous.  Kater, 432 Mass. at 413-414, discussing G. L. c. 234, § 28.  Here, because the audio-video recording of the news broadcast was introduced in evidence at trial (a determination that was pending at the time of jury empanelment), and because it was probative of the circumstances surrounding the defendant's confession, it is not "extraneous" within the meaning of G. L. c. 234, § 28.

That the judge had yet to rule on the admissibility of the news broadcast at the time of empanelment is significant.  In Kater, 432 Mass. at 413, we concluded that there was no abuse of discretion in a judge's decision not to conduct individual voir dire regarding prior bad act evidence in part because, "if the evidence were ultimately not admitted at trial, the questions would have then contaminated the jury."  See Commonwealth v. Ramirez, 407 Mass. 553, 554-557 (1990).

Moreover, there is no suggestion that any juror saw the news broadcast at any time other than in the court room.  See

allegation would render them incapable of being fair and impartial.

Reavis, 465 Mass. at 890 ("The defendant has not indicated, nor does the record suggest, that any of the jurors selected were not fair and impartial").  Indeed, two members of the venire responded affirmatively to the question regarding prior knowledge of the case because they each recalled reading an article in a local newspaper and one of them had a spouse who owned a business in Lawrence.  Although the potential jurors did not remember any specifics about the case, and did not state that their prior knowledge rendered them unable to be fair and impartial, the judge ordered each of them excused.  Accordingly, there was no abuse of discretion in the judge's decision not to conduct voir dire of the venire with respect to the news broadcast.

c.  Introduction of defendant's statement about handling a firearm.  The defendant contends that the judge committed reversible error by allowing the jury to hear prejudicial evidence about the defendant's handling of a firearm in a prior, unrelated incident.  In particular, the defendant objects to the introduction of Max's testimony concerning the defendant's statement that the police "probably want[ed] to talk to him why his fingerprints were on" a gun that he had handled and that a friend of his from Lawrence purportedly had fired.  The judge allowed this testimony to be introduced, over objection, on the ground that it showed consciousness of guilt (i.e., that the

defendant sought to deceive Max as to the reason for the police visit to his house).

Out-of-court statements are not hearsay, and may be admissible substantively when offered to show consciousness of guilt or liability.  See Commonwealth v. Chappell, 473 Mass. 191, 207 (2015) (consciousness of guilt evidence is "relevant to an assessment of the defendant's mental state and whether he was criminally responsible"); Mass. G. Evid. § 1110(a) (2016). Evidence "susceptible of a finding" that a defendant "embarked on a series of actions consciously designed to deflect attention from himself" may indicate consciousness of guilt (citation omitted).  Commonwealth v. Vick, 454 Mass. 418, 424 (2009). Evidence that a defendant provided false information also may be admissible to show consciousness of guilt.  See, e.g., Commonwealth v. Delaney, 442 Mass. 604, 613 (2004) (defendant's lying to coworker to cover up involvement in incident showed consciousness of guilt).

Because the defendant preserved the objection, we review for prejudicial error.  See Commonwealth v. Dargon, 457 Mass. 387, 399 (2010).  We discern no error in the admission of this consciousness of guilt evidence.  The Commonwealth was entitled to show the jury that the defendant sought to deceive his friend regarding the nature of the police investigation.  Further, even if there were error in allowing the introduction of this

testimony, any error would have had little, if any, effect on the jury, given the defendant's other, far more explicit statements of guilt. See Delaney, supra. In addition, in his closing the prosecutor made no mention of the disputed consciousness of guilt evidence. See id.

d. Prosecutor's opening statement. At the end of his opening statement, the prosecutor said:

> "Ladies and gentlemen, this crime went unsolved for months. This crime went unsolved for months. Well, judgment day is here. And, at the end of this case, I'd suggest that you will find that on July 24th of 2010, the defendant murdered Timothy Walker in cold blood."

The defendant immediately sought a mistrial. The judge denied the motion. The defendant contends that this denial was error because the prosecutor's use of the phrase "judgment day" "suggested to the jury the [prosecutor's] long road to victory was expected to end with the jury's guilty verdict."

We review the denial of a motion for a mistrial for abuse of discretion. Commonwealth v. Lao, 460 Mass. 12, 19 (2011). The trial judge is in the best position to assess any potential prejudice and, where possible, to tailor an appropriate remedy short of declaring a mistrial. See Commonwealth v. Amran, 471 Mass. 354, 360 (2016). "[T]he burden of demonstrating an abuse of discretion is a heavy one." Commonwealth v. Medeiros, 395 Mass. 336, 351 (1985).

In opening statements and closing arguments, prosecutors may not "play . . . on the jury's sympathy or emotions, or comment on the consequences of a verdict" (footnote omitted). Commonwealth v. Kozec, 399 Mass. 514, 516-517 (1987). "It is improper for a prosecutor to equate a guilty verdict with justice." Commonwealth v. Francis, 450 Mass. 132, 140 (2007). See Commonwealth v. Degro, 432 Mass. 319, 328-329 (2000) (prosecutor's statement to jury to "do your job" and, implicitly, to find defendant guilty was not permissible argument).

In framing the defendant's trial as his "judgment day," the prosecutor improperly invoked a biblical reference to a day of reckoning and created the impression that it was the jury's duty to bring closure to a long-unsolved killing by rendering a guilty verdict. This was improper and impermissible. We conclude, however, that the judge did not abuse his discretion in denying the defendant's motion for a mistrial in light of his repeated instructions to the jury that opening statements and closing arguments are not evidence. See Commonwealth v. Thomas, 429 Mass. 146, 158 (1999).

e. Prosecutor's closing argument. The defendant contends that certain unobjected-to statements in the prosecutor's closing argument created a substantial likelihood of a miscarriage of justice. In particular, he maintains that the

prosecutor improperly vouched for Michelle's credibility, and presented three arguments that were not supported by the evidence:  that the defendant led a "secret life"; that he did not want Tesseana to meet his friends; and that Max recognized the defendant when police showed him surveillance footage.

Because the defendant did not object at trial, we consider whether any of the challenged statements was improper and, if so, whether it created a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Penn, 472 Mass. 610, 626-627 (2015), cert. denied, 136 S. Ct. 1656 (2016).  We review the statements in the context of the entire closing, the jury instructions, and the evidence introduced at trial.  See Commonwealth v. Costa, 414 Mass. 618, 628 (1993).

i.  Improper vouching.  The defendant argues that certain of the prosecutor's statements constituted improper vouching for the credibility of a witness:

> "You have to believe Michelle is one of the most evil people on this planet to think that she's going to set this guy up for a murder she knew he didn't commit just so he wouldn't see her daughter anymore.  That's what defense counsel wants you to believe.  That is almost wors[e] than shooting [the victim] yourself, to set this guy up for a murder he didn't commit.  For what good reason?  For no good reason, no good reason.  But they talked.  And she asked questions and he let it out.  That is the reality. That's what happened.  It's not pretty but it's true.
>
> "And she told you on the stand she was conflicted about what to do, too.  And where did we hear that before? We heard it just by our last witness, Dolores, when she found those sneakers.  She was conflicted.  She didn't know

what to do.  It's [the defendant].  And she eventually called the police.

"And so when Michelle sat in front of the Lawrence [p]olice [s]tation, not knowing what to do and eventually not going in, going home and then going to the police the next day, that just made sense to her.  And who can judge that?  What do you do?  She ended up doing the right thing."  (Emphases supplied.)

Prosecutors may "argue forcefully for the defendant's conviction."  Commonwealth v. Wilson, 427 Mass. 336, 350 (1998).  The jury are presumed to understand that a prosecutor is an advocate, and statements that are "[e]nthusiastic rhetoric, strong advocacy, and excusable hyperbole" will not require reversal.  Id. at 351.  Prosecutors may not, however, appeal to the jury's sympathy, argue facts not in evidence, or give their own opinion of the evidence or the credibility of a witness.  See Commonwealth v. Sanders, 451 Mass. 290, 296-297 (2008).  A prosecutor engages in improper vouching if he or she "expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury."  Wilson, supra at 352.

The prosecutor's statements here, while they could have been better phrased, do not rise to the level of improper vouching.  A prosecutor properly may comment on and urge the jury to draw inferences from the trial evidence, Commonwealth v. Chavis, 415 Mass. 703, 713 (1993), and may state logical reasons based on inferences from the evidence why a witness's testimony

should be believed.  Commonwealth v. Rolon, 438 Mass. 808, 816 (2003).  See Commonwealth v. Caillot, 454 Mass. 245, 259 (2009), cert. denied, 559 U.S. 948 (2010) (no improper vouching because, "in the context in which the remark was made, the jury would have understood that the prosecutor intended to convey not that he knew what [the witness] had stated was truthful, but that [the witness'] testimony was credible because there was evidence corroborating [the witnesses'] testimony").

In the context of the argument as a whole, the prosecutor's remarks here did not express a personal belief in Michelle's credibility.  The statements were made in response to the defendant's contention, during cross-examination and in closing argument, that Michelle was not credible and that she fabricated the defendant's confession in order to force an end to the defendant's relationship with Tesseana.  Defense counsel argued in his closing that Michelle "was not telling the truth," and that she had persuaded Tesseana to corroborate her story.  The prosecutor permissibly could respond to these challenges.  See Commonwealth v. Bol Choeurn, 446 Mass. 510, 522 (2006) (where credibility is at issue, it is proper for counsel to argue from evidence why witness should be believed).

ii.  Arguing facts not in evidence.  Prosecutors may not "misstate the evidence or refer to facts not in evidence." Kozec, 399 Mass. at 516-517.  They may, however, argue

"forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence." Id. at 516. "Remarks made during closing arguments are considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial." Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 231 (1992).

The defendant contends that the prosecutor's statements that the defendant maintained a secret life in Lawrence and that the defendant did not want to meet Tesseana's friends or allow her to meet any of his friends were not supported by the evidence. Evidence was introduced at trial, however, that the defendant rarely saw Tesseana other than at her mother's house, she rarely met any of his friends, she had not met any member of his family, and his mother was unaware that he had a girl friend in Lawrence. There was also evidence that Max, the defendant's friend and housemate, whom he had known since high school, never met Tesseana or any of the defendant's friends from Lawrence.

With respect to the defendant's challenge to the prosecutor's statement that Max had "recognized" the defendant on a recording of the video surveillance footage that police played for him, Max's testimony supported this inference. Max, the defendant's former football teammate, testified that, when police showed him a copy of the surveillance footage, he said that the shooter's walk was "similar" to the defendant's, his

build was a "lot similar," and the way in which the man in the footage ran was "very similar."  The interviewing officer also testified that Max's "head dropped" when he saw the recording, and that he "put his hands up to his head."  In his closing argument, the prosecutor referred specifically to Max's testimony that the shooter walked, ran, and was built "like" the defendant.  Thus, the prosecutor's statements were not impermissible inferences, and it is unlikely that the jury would have been misled by the use of the word "recognized."[11]

f.  Review pursuant to G. L. c. 278, § 33E.  We have carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and discern no reason to order a new trial or to reduce the conviction to a lesser degree of guilt.

Judgment affirmed.

---

[11] We have considered the arguments in the defendant's brief filed pursuant to Commonwealth v. Moffett, 383 Mass. 201 (1981), and conclude that they are unavailing.